[Crim. No. 11991. In Bank. Sept. 16, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. VASSIE
WASHINGTON, JR., Defendant and Appellant.

David M. Rothman, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Bradley A. Stoutt, Deputy Attorney General, for Plaintiff and Respondent.

SULLIVAN, J.—Defendant Vassie Washington, Jr. was charged in count I of an information with the murder of Tijuana Sprewell (Pen. Code, § 187), in counts II, III and IV with the attempted murders of Natasha Washington, Bobby Washington and Anthony Chambers (Pen. Code, § 664), and in count V with arson. (Pen. Code, § 447a.) He was also charged with two prior felony convictions which he admitted. A jury found defendant guilty on all counts and fixed the

penalty on the murder count at death. Defendant was sentenced on the murder count to death.[1] This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Viewing the record in the light most favorable to the People as we are bound to do following a guilty verdict (*People* v. *Teale* (1969) 70 Cal.2d 497, 502 [75 Cal.Rptr. 172, 450, P.2d 564]), we proceed to set forth the pertinent facts. At some time between 6:30 and 7:30 p.m. on November 26, 1966, defendant and Bobby Miles went in defendant's automobile to the home of Clifford Hayes in Long Beach to play cards. Both men had spent the morning and early afternoon together drinking whiskey and beer, had parted and had met again in the early evening.

About 9:15 p.m. defendant, accompanied by one Smith, left the card game to look for defendant's wife, Vernie Washington, at the apartment of one of her friends, Dorothy Procks, also in Long Beach. Upon defendant's arrival, one of Dorothy's brothers told defendant Vernie was not there, although in fact she was. Apparently defendant did not believe the brother and an altercation ensued in the alley behind Dorothy's house between defendant and another of Dorothy's brothers. During the course of this fight defendant was struck on the forehead by a large piece of wood which caused a laceration over defendant's eye. Defendant, thereupon, seized another piece of wood, entered Dorothy's apartment and smashed some of her furniture and light fixtures. Dorothy at this time was in an upstairs neighbor's apartment with Vernie, and, hearing the disturbance in her apartment, called the police. By the time they arrived, however, defendant had left.

Defendant was driven away in another car to Bobby Miles' home and one of his friends moved defendant's Oldsmobile and parked it near the intersection of 21st and Orange Streets. Miles, seeing that defendant was injured, took him to a hospital in defendant's other car, a Cadillac, which had been in Miles' possession. They arrived at the hospital between 10 and 11 p.m. but defendant was refused treatment, because he would not sign certain forms required by the hospital. The admitting clerk testified that defendant did not appear to be either intoxicated or dazed.

Defendant and Miles then drove around Long Beach and Anaheim in the Cadillac. About 11:30 p.m., as they

---

[1] The record does not disclose that defendant was sentenced on the remaining counts.

approached the intersection of 21st and Orange Streets in Long Beach, they saw defendant's Oldsmobile on fire and firemen attempting to extinguish the blaze. Miles parked the Cadillac and defendant got out and approached the burning car.

Fireman Lundin testified that defendant asked him to open the trunk because there was a can of gasoline inside. The fireman, believing that defendant was concerned with the danger of the can exploding, reassured defendant that the fire was under control and that there was nothing to worry about. Defendant, however, replied, "The hell with the fire, man. I want the gasoline." Since defendant had no key to the trunk, Lundin refused to force it open. Defendant, after trying to open the trunk with a tire iron, walked away. Fireman Lundin testified that he later found a "jeep" can of gasoline in the trunk and four or five Texaco Texamatic transmission fluid cans in the rear seat.

Defendant returned to his Cadillac and told Miles he was going to drive to his mother's house. Miles left on foot. Rickey Ivey, a 14-year-old boy who was acquainted with defendant and was also present at the scene of the car fire, testified that just before defendant drove off alone in the Cadillac, he heard him say, "I am going to get that dirty whore."[2] Defendant then drove away on Orange Street toward the Pacific Coast Highway.

Clarence Strickland, the attendant at the Parks Texaco Station at Pacific Coast Highway and Lewis Street, about a half mile from the car fire, testified that defendant came into the station between 11 p.m. and midnight. He asked Strickland for a can of gasoline and Strickland gave him some in a one quart Texamatic transmission fluid container with one hole punched in the top. Defendant appeared to Strickland to be coherent and sober. He drove away quickly. Ten or fifteen minutes later Strickland heard fire sirens.

At 11:55 p.m. Fireman Lundin's unit, which was still at the scene of the car fire, received an alarm for a fire at apartment 7, 1349 Wesley Drive, Vernie Washington's residence. Lundin's unit was the first to reach the building; when he entered the burning apartment he found in a hallway four-year-old Natasha Washington who had been burned. He discovered that the fire was in the south bedroom of the two-

[2]Vernie Washington married defendant in 1963 shortly before he went to prison. Vernie's child, Tijuana Sprewell, was conceived and born while defendant was still in prison.

bedroom apartment. Lundin heard a child crying in the corner of the burning room, but because of the intense heat and smoke, could not reach her. Shortly thereafter another fireman with special breathing equipment was able to rescue the child, 17-month-old Tijuana Sprewell, Vernie Washington's daughter. The child was badly burned and was removed to a hospital by ambulance.

In the north bedroom of the apartment the firemen found a Texaco Texamatic can similar to the can in which Strickland gave defendant gasoline. A small amount of liquid was left in the can and the firemen concluded that it was inflammable. The police seized the can as evidence. There were smudged fingerprints on it and, on the rim, a red substance later identified to be human or animal blood. The blood was in such a position that when the fingers of the left hand were placed on the smudged fingerprints, the red substance was located at the web of the hand between the thumb and forefinger. Defendant, when arrested, had a small cut on the webbing of his left hand between his thumb and forefinger.

The fire for the most part was located in the south bedroom, but there were small spot fires on the carpet in the living room and hallway. An arson investigator of the Long Beach Fire Department was of the opinion that the fire was caused by human hands because of the presence of the spot fires. Based on his experiments he concluded that the fire was started by gasoline.

Anthony Chambers, Vernie's nine-year-old son, testified that on the night of the fire he was lying in bed awake. He slept in the south bedroom in the same bed with his two sisters, Natasha and Tijuana; Bobby Washington, Anthony's brother, slept in another bed in the same room. The children were alone in the apartment and in their beds when Anthony heard a window in the living room slide open and then heard the front door open.[3] A light went on in the kitchen and Anthony saw defendant enter the south bedroom. Defendant had a can in his hand and was holding a towel up to his head; there was blood on his grey sweater. According to Anthony the Texamatic can later found in the apartment looked like the can he had seen in defendant's hand. Defendant poured the contents of the can onto Bobby's bed and on the floor and lit a match causing the fluid to ignite. He then took the can into the north bedroom, put it down and left the apartment.

[3]Anthony had seen defendant enter the apartment in this manner on prior occasions when the front door was locked.

Anthony got out of bed, and went into the living room. He looked out of the window and saw defendant going down the stairs. He then returned to his bedroom and from the window saw defendant's Cadillac moving down the alley behind the building. Anthony finally went to a neighbor's apartment and informed her of the fire.

Rickey Ivey was on his way home from the car fire and noticed smoke coming from the apartment where he knew Anthony Chambers lived. When he reached the apartment building he saw defendant's Cadillac moving down the alley but he could not see the driver. About the same time he saw Anthony run down the stairs to another apartment.

The evidence also showed that earlier in the evening, between 10 and 10:30 p.m., police officers, accompanied by Vernie Washington, went to the latter's apartment to find defendant and question him with regard to his actions at Dorothy Prock's apartment. Defendant was not there. The officers testified that they did not see a Texamatic can anywhere in the apartment.

Lucille Douglas, Vernie's mother, testified that on the night of the fire police officers brought Bobby Washington and Anthony Chambers to her house. Anthony was crying and shaking and was "pretty upset [and] hysterical." He told Lucille that "Vassie had burned his baby, had set fire to his baby and burned her."

Bobby Miles testified that a maximum period of five minutes elapsed from the time defendant left the scene of the car fire until defendant returned to Miles' home. In Miles' opinion defendant could not have set the fire in that period if he first had to go to the Parks Texaco Station.

Dr. David Wood testified for the People that Tijuana Sprewell died on December 12 as a result of burn injuries sustained in the fire. She was 17 months old. The court refused to admit into evidence pictures taken of Tijuana at the hospital because it felt that their prejudicial effect outweighed their probative value. However, the doctor was permitted to testify that portions of Tijuana's fingers came off when dressings were changed and that the child cried out when she was touched. Over objection, the doctor was also allowed to testify that he had trouble obtaining the assistance of nurses because of the "unpleasantness of the case." Natasha Washington was exhibited to the jury to demonstrate the nature and extent of her own burn injuries.

Defendant did not take the stand at the guilt phase of the trial. Two physicians testified on his behalf that at the time of the fire defendant was suffering from brain damage which, when aggravated by his alcoholic intake, deprived him of the ability to premeditate, deliberate and reflect meaningfully upon the nature and consequences of his actions. In support of the medical testimony the defense also introduced evidence that during the afternoon and early evening hours of November 26 defendant was intoxicated. In rebuttal, the prosecution introduced the testimony of three doctors whose opinions contradicted those of the defense medical experts. It also introduced evidence which tended to show that at the time immediately surrounding the fire, defendant did not appear to be intoxicated. The medical testimony will be discussed in more detail, *infra*.

The parties stipulated that at the penalty proceedings the jury could consider all of the evidence introduced during the guilt phase. In addition, the prosecution introduced evidence of a statement made by defendant to Vernie when he was brought into the police station as well as evidence of numerous prior crimes committed by defendant.

Defendant testified in his own behalf at the penalty trial. He denied setting the fire which resulted in Tijuana's death and he testified that after leaving the scene of the car fire he went to his mother's house and then returned to Bobby Miles' home. He also indicated that when he was 15 or 16 years old he helped save the lives of two firemen while he was working at a forestry camp. The only other evidence introduced on defendant's behalf at the penalty phase was the testimony of his mother and his minister.

1. *Rehabilitation of witnesses by prior consistent statements.*

Defendant first contends that the admission into evidence for the purpose of rehabilitating two prosecution witnesses of certain prior consistent statements as substantive evidence under Evidence Code section 1236 violated his right of confrontation guaranteed to him by the Sixth Amendment to the United States Constitution. Relying upon *People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111], defendant argues that the rule we announced in that case with reference to the admission of prior *inconsistent* statements under Evidence Code section 1235 should also apply to the admission of *consistent* statements under section 1236.

As previously indicated, Anthony Chambers, called as a witness for the People, testified that he saw defendant star the fire in the apartment. On cross-examination the defense impeached Anthony by introducing his testimony given at the preliminary hearing where he stated that he told Dorothy Procks that he had not seen who started the fire. For the purpose of rehabilitating Anthony the prosecution introduced the testimony of three witnesses as to prior statements made by him consistent with his testimony at trial. Dorothy Procks testified, over a defense objection on the ground of hearsay, that two or three days after the fire Anthony told her that he had seen defendant start the fire. Over a similar objection Long Beach Police Sergeant Welch testified that two days after the fire Anthony told him that defendant had set the fire. Finally, Anthony's grandmother testified without objection that on the night of the fire Anthony told her that defendant "had burned his baby, had set fire to his baby and burned her."

Rickey Ivey, the second prosecution witness, testified on direct examination that as defendant was leaving the scene of the car fire at 21st and Orange Streets he said, "I am going to get that dirty whore." On cross-examination the defense impeached Rickey by introducing his testimony given at the preliminary hearing where he stated that all he heard defendant say was that "I am going to get that . . . ." and that he "didn't get the rest of it." On redirect examination Rickey explained that at the preliminary hearing he did not repeat the phrase "dirty whore" because his parents had told him "not to say curse words in front of people." The prosecution also introduced without objection the testimony of Long Beach Police Sergeant Greenleaf that on February 23, 1967, Rickey told him that he heard defendant say he was going to get "that whore."

In *Johnson* we held that Evidence Code section 1235, allowing the introduction of prior inconsistent statements for substantive use in criminal cases is unconstitutional in that it deprives the defendant of his right to cross-examination under the confrontation clause. We there proscribed the substantive use at trial of prior testimony of witnesses given at a grand jury proceeding because the defendant did not have the right to cross-examine those witnesses at the time the prior statements were made. In *People v. Green* (1969) 70 Cal.2d 654, 665 [75 Cal.Rptr. 782, 451 P.2d 422], we held that even "cross-examination at trial on prior testimony, together with

ross-examination at the time of the statement before a differ-nt trier of fact, is not a valid substitute for constitutionally dequate confrontation.'' We reasoned that in order for cross-examination to be constitutionally adequate it must be ''at the *same time* as the direct testimony is given, [and] before the *same trier* as must ultimately pass on the credibility of the witness and the weight of that testimony.'' (*Id.* at p. 661.)

Evidence Code section 1236 permits the introduction of prior consistent statements of witnesses for substantive use if such statements are otherwise properly admissible.[4] It is thus similar to section 1235 except that the former deals with consistent statements whereas the latter deals with inconsistent statements. Historically both types of prior statements were admissible only for the limited purpose of supporting or attacking credibility. (See *People* v. *Kynette* (1940) 15 Cal.2d 731, 753-754 [104 P.2d 794], overruled on other grounds, *People* v. *Snyder* (1958) 50 Cal.2d 190, 197 [324 P.2d 1] (prior consistent statements) ; *People* v. *Johnson, supra,* 68 Cal.2d at pp. 650-651 (prior inconsistent statements) ; Witkin, Cal. Evidence (2d ed. 1966), § 537, p. 510.) The Evidence Code, however, has purported to expand the admissibility and to permit their full substantive use.

We are unable to perceive any basic difference between the admission as substantive evidence of prior *inconsistent* statements of a witness on the one hand and prior *consistent* statements on the other. There appears to be no significant factor present in the former situation whose absence in the latter would obviate any infringement of a defendant's constitutional right to confrontation in a criminal case. The use as substantive evidence of prior consistent statements is not one of the traditional hearsay exceptions developed over a long period of time and given recognition in countless decisions of English and American courts. These long established and deep-rooted exceptions to the hearsay rule have in the main been constructed on the twin doctrinal principles of necessity

[4]Evidence Code section 1236 provides: ''Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791.''

Evidence Code section 791 provides in relevant part: ''Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; . . .''

for the admission of the evidence and the circumstantial probability of its trustworthiness. (See 5 Wigmore on Evidence (3d ed. 1940), § 1240 et seq., p. 202 et seq.) Both of these principles are inoperative where prior inconsistent or prior consistent statements are admitted for their substantive evidentiary effect because: (1) when the witness is in court and available to testify there is no compelling necessity for the substantive use of the prior statements;[5] and (2) nothing in the requirements for the admission of these prior statements gives rise to any circumstantial probability of trustworthiness such as is present in other hearsay exceptions.[6]

Most exceptions to the hearsay rule actually eliminate confrontation on the rationale "that the statement offered is free enough from the risk of inaccuracy and untrustworthiness, so that the test of cross-examination would be a work of supererogation." (5 Wigmore, op.cit. supra, at § 1420, p. 202.) The twin principles mentioned above therefore become significant in the case before us in determining whether evidence of prior statements should be admitted for substantive use despite the denial to the defendant of an opportunity to be confronted with the declarant. (Cf. People v. Green, supra, 70 Cal.2d at p. 660.) ■ Since these two principles are not factors in the rules set forth in Evidence Code sections 1235 and 1236, we must conclude that in criminal cases at least, these sections operate to deprive the defendant of his constitutional right to cross-examine the declarant with respect to such prior statements. We conclude, therefore, that under the rationale of Johnson and based upon the Sixth Amendment, Evidence Code section 1236 is unconstitutional in criminal cases insofar as it permits the substantive use of prior consistent statements against defendant.

■ We reject the Attorney General's contention that not even under Johnson would the prior statements here in issue be excluded because Johnson proscribes only the substantive use of prior statements made at a "preliminary trial or adver-

---

[5]Compare, for example, the element of necessity which is supplied in the former testimony exception to the hearsay rule (Evid. Code, § 1291) by the requirement that the hearsay declarant be unavailable as a witness.

[6]One clear example of the circumstantial probability of trustworthiness of hearsay evidence is found in Evidence Code section 1240, the spontaneous declaration exception. That section requires that the statement be made "spontaneously while the declarant was under the stress of excitement" caused by perception of an act or event. This requirement generally eliminates any possibility that the declarant had an opportunity to fabricate his story.

sary proceedings where testimony under oath was perpetuated with the possibility of its future use against'' the defendant. No such limitation is imposed upon the rule of *Johnson*. Any prior inconsistent statement made by a witness which is introduced for substantive use under Evidence Code section 1235 against a criminal defendant is error under *Johnson*. ■ The confrontation clause is not limited in its application only to prior statements made at judicial or quasi-judicial proceedings; it guarantees to the defendant the right to be confronted by *all* of the witnesses against him, not just some of them. (See *People* v. *Graham* (1969) *ante,* pp. 303, 323-324 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Sam* (1969) *ante,* pp. 194, 207-208 [77 Cal.Rptr. 804, 454 P.2d 700].) As we have explained, we find this rationale is equally applicable to Evidence Code section 1236.

■ The Attorney General also impliedly asserts that even if the rationale of *Johnson* applies so as to proscribe the substantive use of prior consistent statements, nevertheless the jury was not instructed to give such statements substantive use in the instant case and that accordingly there was no error. The jury was instructed in the language of CALJIC No. 52 (1967 revision), that in determining the credibility of a witness they could consider ''a statement previously made by him that is consistent with his testimony.'' They were also instructed that they were ''the exclusive judges of the facts and of the effect and value of the evidence, but you must determine the facts from the evidence received here in court.'' Nowhere were they instructed that they must *not* give substantive use to the prior consistent statements. ''In the absence of a specific instruction expressly limiting the jury's use of the extrajudicial statements to [rehabilitation], '[a]n assumption that the jury considered this evidence only to measure credibility would be unrealistic.' [Citations.]'' (*People* v. *Odom* (1969) *ante,* pp. 709, 716 [78 Cal.Rptr. 873, 456 P.2d 145].) We thus conclude that there was constitutional error.[7]

■ We are satisfied, however, that the error was harmless to defendant ''beyond a reasonable doubt.'' (*Chapman* v.

---

[7]Defendant is not precluded from raising the error here involved for the first time on appeal. At the time of the trial *Johnson* had not yet been decided and it therefore would have been a futile gesture for defendant to have objected to the introduction of the prior consistent statements which were properly offered under the provisions of the Evidence Code. (*People v. Odom, supra, ante,* pp. 709, 717.)

*California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065] ; see *People* v. *Johnson, supra,* 68 Cal.2d at p. 660.) The prior extrajudicial statements of the witnesses were in form and substance substantially identical with the in-court testimony of the witnesses at the trial. The jury was obviously free to give the in-court testimony full substantive use if they believed it and defendant's conviction indicates that they did. Since the hearsay statements were identical with the courtroom testimony, the jury could not have logically believed the former and disbelieved the latter. In short, the only value of the prior statements lay in the mere repetition of what had been said on direct examination.[8] There was thus no " 'reasonable possibility' " (*Chapman* v. *California, supra,* 386 U.S. at p. 23 [17 L.Ed.2d at p. 710]) that the constitutional error contributed to defendant's conviction.

2. *The prosecution's rebuttal evidence allegedly alluding to prior convictions admitted by defendant.*

Defendant complains that since he admitted the two prior convictions charged in the information, the introduction by the People in rebuttal of evidence from which the jury could have inferred that he had suffered such convictions was prejudicial error under Penal Code section 1025.

The main defense asserted at trial was that defendant "was deprived of his ability to meaningfully deliberate on the nature and consequences of his act on the night in question because of the results of a blow to the head and his large alcoholic intake during the day." In support of this theory defendant called Dr. Marinacci, a neurologist, and Dr. Tweed, a psychiatrist.

Dr. Marinacci made an electroencephalographic study of defendant on May 10, 1967, which revealed damage to the left side of the brain resulting from an injury. He testified that the brain damage was aggravated by an intake of alcohol and characterized defendant's condition as psychomotor epilepsy.

---

[8] We do not mean to imply by our holding herein that the introduction of prior consistent statements for substantive use will always be harmless error. We are here dealing with prior statements which were substantially identical both in form and substance with the in-court testimony of the witnesses and there was thus no possibility that the jury gave substantive value to anything in the hearsay statements that was not present in the courtroom testimony. Where, however, the prior statements are more detailed or different in any other material respect from the testimony given in court so that if given substantive use they would add facts in addition to those stated in the witness' testimony, then it might well be held to be prejudicial error.

On cross-examination it was brought out that Dr. Marinacci felt that the brain damage had been building up from a traumatic injury which had occurred at least 18 months prior to the electroencephalogram (hereafter EEG) and may in fact have been building up from the first part of defendant's life.

Dr. Andre Tweed examined defendant on February 19, 1967, and replied in response to a hypothetical question based upon the facts of the case that he felt that defendant was not capable of premeditating, deliberating or reflecting meaningfully upon the nature and consequences of his acts. Dr. Tweed was also of the opinion that defendant had brain damage which was aggravated by the blow to his head and by alcoholic intake. He stated that Dr. Marinacci's EEG corroborated his opinion.

In rebuttal the People called Dr. George Abe, a psychiatrist, who testified in response to a hypothetical question based on the facts of the case, that he believed defendant had the mental capacity on the day of the fire to "meaningfully deliberate and premeditate and reflect upon the gravity of his contemplated acts and to harbor the intent to kill or commit a felony." Outside the presence of the jury the prosecutor offered to prove that defendant's mental state was attributed to "a personality situation rather than an organic type of situation" as described by the defense medical testimony. He sought to introduce into evidence portions of defendant's cumulative case summaries from the California Youth Authority and the California Adult Authority, including psychological reports considered by Dr. Abe in reaching his opinion. The defense objected that these reports were improper rebuttal evidence; the objection was overruled and the reports were read to the jury. One portion of a report stated, "This inmate has not improved and is in need of further institutional programming." Another excerpt indicated that, "He admits his present offenses but continues to minimize them."

Defendant also objected out of the presence of the jury to the proffered rebuttal testimony of Dr. Schmidt, chief psychiatrist at San Quentin, on the grounds that it constituted improper rebuttal not only because a showing of a personality disorder would in no way tend to rebut the defense showing of organic brain damage, but also because the jury could infer from the testimony that defendant was a convicted felon. In reply the prosecutor contended that since the defense actually was attempting to show that defendant acted in a "situ-

ational setup'' caused by excessive drinking and the blow to his head, it was permissible for the People to prove that defendant was not in a ''situational'' state but rather was of a ''passive-aggressive personality of the aggressive type'' with schizoid and antisocial features and that the blow to the head and his alcoholic intake did not prevent him from being able to premeditate and deliberate. The prosecutor further urged that since Dr. Marinacci testified that defendant's brain damage was the result of a traumatic injury at least 18 months old, it would be proper rebuttal for the People to show that tests made on defendant 18 months prior to the EEG revealed no brain damage.

The court overruled defendant's objection holding that under Evidence Code section 352 the probative value of the evidence outweighed any prejudice to defendant by the revelation of his past criminal record. Dr. Schmidt then testified that between 1963 and April 1966, various psychological, physical and neurological studies were made of defendant under the authority of the Department of Corrections to treat prisoners. He explained that in these matters first priority was given to sex offenders and second priority to persons convicted of ''crimes against people, violence of some kind.'' The results of the tests upon defendant indicated that after entering San Quentin his sociopathy became worse. The tests did not reveal any brain damage.

Defendant argues that Dr. Schmidt's testimony in its entirety constituted improper rebuttal evidence since it related to defendant's mental state no later than April 1966 and only defendant's state of mind in November 1966 was in issue. He also contends that the prejudicial effect of the admission of evidence of his past criminal record far outweighed any probative value it might have had, that its admission was in violation of the provisions of Penal Code section 1025 since he admitted the priors charged to him in the information, and that at the very least the evidence of his criminal record should have been severed from the testimony of the doctors.

There was no error in the admission of the rebuttal medical testimony. The main defense contention was that defendant was suffering from psychomotor epilepsy on the night of the fire caused by brain damge resulting from the blow to the head and aggravated by defendant's alcoholic intake during the day. Dr. Marinacci was of the opinion that the brain damage disclosed by the EEG was due to scar tissue

which had been forming for at least 18 months and possibly from the time of defendant's birth. It was therefore proper for the prosecution to show that 18 months prior to the administration of the EEG, psychiatric examinations of defendant revealed no brain damage and also revealed that defendant's personality disorder was of such a nature that he could react violently and commit an act of premeditated murder.

When a prior conviction charged to the defendant is admitted by him, Penal Code section 1025 provides that such charge "must not be read to the jury, nor alluded to on the trial." (See *People* v. *Rolon* (1967) 66 Cal.2d 690, 693-694 [58 Cal.Rptr. 596, 427 P.2d 196].) However, that section "was not designed to exclude relevant evidence. . . ." (*People* v. *Peete* (1946) 28 Cal.2d 306, 320 [169 P.2d 924]), and "[e]xcept when it shows merely criminal disposition, evidence which tends to establish a fact material for the prosecution is admissible although it may connect the accused with an offense not included in the charge." (*People* v. *Cook* (1967) 252 Cal.App.2d 25, 28 [60 Cal.Rptr. 133].) Furthermore, Evidence Code section 1101 allows the introduction of evidence of the defendant's prior criminal acts when it is "relevant to prove some fact . . . other than his disposition to commit such acts." Since the medical rebuttal testimony was properly admitted on the issue of defendant's mental capacity no violation of Penal Code section 1025 occurred unless the evidence of defendant's criminal record should have been severed from the medical content of the testimony.

In contending that severance should have been ordered defendant relies upon *People* v. *Kelley* (1967) 66 Cal.2d 232, 239 [57 Cal.Rptr. 363, 424 P.2d 947], where it was said with reference to evidence of uncharged crimes that "[i]n every case the possibility of severing relevant from irrelevant portions of evidence should be considered to protect the accused from undue prejudice." (See also *People* v. *Dabb* (1948) 32 Cal.2d 491, 500 [197 P.2d 1].)

We do not believe that the trial court abused its discretion in admitting the medical testimony even though it tended to show that defendant at one time was in the custody of the Department of Corrections. Dr. Abe's testimony was objected to solely on the ground that it constituted improper rebuttal. No objection was made by defendant on the ground that it would reveal defendant's previous imprisonment, nor did he move to strike such testimony after it was given. He

cannot now raise this as error for the first time on appeal. (*People* v. *Varnum* (1969) 70 Cal.2d 480, 486 [75 Cal. Rptr. 161, 450 P.2d 553] ; *People* v. *Cockrell* (1965) 63 Cal.2d 659, 667 [47 Cal.Rptr. 788, 408 P.2d 116].) ▆ It was proper for the jury to be informed about Dr. Schmidt's professional occupational position as chief psychiatrist at San Quentin and the circumstances under which he was familiar with defendant, namely, that he was connected with certain tests performed on defendant while he was an inmate at the prison. These were proper foundational matters to aid the jury in the evaluation of the doctor's testimony and were not severable from its medical content without substantially impairing the value of the testimony.[9]

▆ We caution, however, that there is a great potential for abuse in eliciting this type of testimony. Whenever possible, the trial court should give serious consideration to ordering the severance of portions of testimony so as to protect the rights of the defendant without totally destroying the value of the witness' testimony. ▆ As we have indicated, severance was inappropriate in the instant case and the prosecutor, by limiting his inquiries of Dr. Schmidt to necessary and proper foundational matters, did not exceed the scope of permissible examination. We find no error.

3. *Admission of evidence in support of prosecution's theory of murder by torture.*

We now turn to defendant's contention that the People's evidence as to the burns sustained by the children, Tijuana Sprewell and Natasha Washington, and the pain and suffering resulting therefrom, "was designed to inflame the jury against defendant and obtain a guilty verdict and the death penalty," and that such evidence should have been excluded as unduly prejudicial. It is further pointed out to us that in his closing argument to the jury, the prosecutor referred to such evidence.

The evidence complained of consisted of the testimony of Dr. Woods that 86 percent of Tijuana's body suffered third degree burns, that pieces of her skin fell off when she was

---

[9]Although the doctor probably did not have to state the priority groups for the treatment of inmates, he did not actually state the crimes for which defendant was convicted. We believe that any error connected with this "volunteered" information was harmless to defendant in light of the circumstances in which the testimony was given and the facts which it properly revealed. Further, the prosecutor did not attempt to expand this portion of the doctor's testimony nor does it appear that he emphasized it in argument.

bathed and that he had trouble securing nurses because of the unpleasantness of the case. In addition Natasha's burns were exhibited to the jury. Defendant also complains that when the prosecutor asked Tijuana's grandmother if she saw Tijuana at the hospital she indicated that she would rather not talk about it. In addition, defendant objects to the testimony of Officer Welch describing the nature and extent of the burns.

At the outset it should be noted that defendant failed to object to any of the above evidence except the testimony of Dr. Woods with regard to his ability to secure nursing assistance. Under such circumstances he may not raise such error for the first time on appeal. (Evid. Code, § 353; *People* v. *Varnum, supra,* 70 Cal.2d at p. 486; *People* v. *Robinson* (1965) 62 Cal.2d 889, 894 [44 Cal.Rptr. 762, 402 P.2d 834].)

However, even had defendant properly objected to such evidence the testimony was clearly admissible in support of the prosecution's theory of murder by torture. (See Pen. Code, § 189.) This type of murder is perpetrated when " 'the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity.' " (*People* v. *Martinez* (1952) 38 Cal.2d 556, 561 [241 P.2d 224].) Although suffering alone is not sufficient to establish the requisite intent, " [n]evertheless such intent may be inferred from the condition of the decedent's body. . . ." (*People* v. *Butler* (1962) 205 Cal.App.2d 437, 441 [23 Cal.Rptr. 118] ; see *People* v. *Turville* (1959) 51 Cal.2d 620, 632 [335 P.2d 678], overruled on other grounds, *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal. Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].) Under these rules it was proper for the prosecution to introduce evidence as to the extent of injuries to Tijuana and Natasha without being limited, as defendant contends, to showing merely that the children were burned as a result of the gasoline being thrown into their bedroom.

Defendant may not now for the first time attempt to assign misconduct on the part of the prosecutor in his arguments to the jury in the guilt and penalty phases of the trial with respect to the circumstances of Tijuana's death.[10] "Misconduct of the prosecuting attorney

---

[10]Although defendant objected to argument in the penalty phase referring to the circumstances of Tijuana's death, the basis of the objection was that it constituted improper rebuttal, not that it constituted mis-

may not be assigned as error on appeal if it has not been assigned at the trial unless, the case being closely balanced and presenting grave doubt of the defendant's guilt, the misconduct contributed materially to the verdict or unless the harmful results of the misconduct could not have been obviated by a timely admonition to the jury.'' (*People* v. *Varnum, supra,* 70 Cal.2d at p. 488.) ▮ The arguments, based upon properly admitted evidence, were permissible under a theory of murder by torture and did not constitute misconduct.

### 4. *Alleged misconduct of the prosecutor.*

▮ Defendant asserts that the prosecuting attorney committed prejudicial misconduct during his argument to the jury at the guilt trial. We note that defendant made no assignment of misconduct or objection to any of the prosecutor's arguments of which he now complains and under the above-stated rule (see *People* v. *Varnum, supra,* 70 Cal.2d 480, 488) he is precluded from raising the point for the first time on appeal. Nevertheless, we propose to examine the specifications in the order presented.

▮ *First*: Defendant complains of the prosecutor's argument in which he presented his theory of defendant's possible motive for the murder. He stated that '' [w]e know that apparently the defendant was in prison up to about the 30th of April, had been in there for several years. . . . We also know that there was obviously a child not his [Tijuana] that was conceived and born while he was in prison.'' The district attorney then theorized that perhaps defendant thought Tijuana was in the bed on which he poured the gasoline, his intent being to kill her because she was the child of Vernie by another man. Defendant now contends that this argument was not based upon the evidence and that in any event '' [i]t is not a reasonable and logical conclusion to draw from the fact that a child was born and conceived while defendant was in prison to the motive to kill that child.''

▮ We do not believe that the prosecutor committed any misconduct in making this argument to the jury. '' 'The right of counsel to discuss the merits of a case, both as to the law

---

conduct. The prosecutor argued to the court that it was proper rebuttal and the court apparently agreed but nevertheless admonished the jury that the statements were only arguments by counsel and not evidence. Our reading of the arguments indicates that they were not calculated to inflame the passion of the jury and that they were therefore not prejudicial.

and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom. The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury.' '' (*People* v. *Eggers* (1947) 30 Cal.2d 676, 693 [185 P.2d 1].) ▆▆ ▆ The district attorney's argument as to defendant's motive for the killing was a reasonable interpretation of evidence properly before the jury. We have previously held admissible that portion of Dr. Schmidt's testimony indicating that defendant was in prison from 1963 until his parole in April 1966. Dr. Wood testified that Tijuana was 17 months old at the time of her death. Since matters of common knowledge may be "referred to and interwoven" into the prosecution's argument (*People* v. *Johnson* (1950) 99 Cal. App.2d 717, 730 [222 P.2d 335]; see *People* v. *Love* (1961) 56 Cal.2d 720, 730 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809], overruled on other grounds, *People* v. *Morse, supra,* 60 Cal.2d 631, 649) it was proper for the district attorney to state that Tijuana could not have been the child of defendant. It was then permissible for the district attorney to infer a motive from the evidence (see *People* v. *Burwell* (1955) 44 Cal.2d 16, 39 [279 P.2d 744]); it was for the jury to determine if it was illogical.

▆ *Second*: Defendant asserts that the prosecutor's argument with respect to the credibility of Bobby Miles was a misstatement of the evidence and was therefore improper. On direct examination Miles testified that he had been with defendant from 8:30 a.m. until 1 p.m. on November 26, 1966, then again from 6:30 p.m. until defendant went to Dorothy Procks' home at 9:15 p.m. and finally they met again at 9:45 p.m. when defendant was brought to Miles' house. On cross-examination the prosecutor asked Miles if he had told Sergeant Taylor that he met defendant at about 9:30 p.m. on the evening of the murder and Miles replied in the negative. In rebuttal Sergeant Taylor testified that he had a conversation with Miles relating to his contacts with defendant "on the day and evening of the 26th of November 1966," and that Miles told him, "I met Vassie Washington at about 9:30 p.m. that night." The prosecutor argued to the jury that Miles' statement of his meetings with defendant on the day of the murder was inconsistent with what he told Sergeant Taylor.

This argument was proper. Miles testified on cross-examination that he did not tell Sergeant Taylor that he met defend-

ant at 9:30 on the night of the murder and Sergeant Taylor testified that Miles told him he *did* meet defendant at 9:30. Miles was thus impeached by a prior inconsistent statement and it was permissible for the prosecutor to point out the inconsistency in the testimony in order to attack the credibility of the witness. (See *People* v. *Perez* (1962) 58 Cal.2d 229, 245 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946].)

■ *Third*: Defendant assigns as misconduct the prosecutor's argument that Dr. Tweed was a defense oriented doctor because he was hired by defendant's previous counsel and was not appointed by the court. Dr. Tweed testified that he was not a court-appointed psychiatrist but that he had been hired by defendant's former counsel. Since Evidence Code section 722, subdivision (b), provides that the compensation paid by a party to an expert witness "is a proper subject of inquiry by any adverse party as relevant to the credibility of the witness and the weight of his testimony," it would appear equally permissible to argue as to the credibility of a witness from the fact of employment. (See *People* v. *Tomalty* (1910) 14 Cal.App. 224, 235 [111 P. 513].) There was thus no misconduct.

*5. Defendant's offer to waive trial by jury.*

■ Defendant asserts that prior to the commencement of the jury selection procedure he offered to waive a trial by jury but that the prosecuting attorney refused to consent. This rejection of the offer of waiver is alleged by defendant to be a denial of his "constitutional right to waive trial by jury."

■ The only indication that defendant attempted to waive a trial by jury is derived from a written declaration by defendant's trial counsel appended to the opening brief which states that prior to jury selection the declarant, with the consent of defendant, offered to waive a jury trial but that such offer was rejected by the deputy district attorney. We may not consider the declaration in support of defendant's contention and without it the record is devoid of any indication that an offer was made and rejected. It is defendant's duty to make a sufficient record by which the court may determine error. " 'Matters not presented by the record cannot be considered on the suggestion of counsel in briefs.' " (*People* v. *Merriam* (1967) 66 Cal.2d 390, 397 [58 Cal.Rptr. 1, 426 P.2d 161].)

■ In any event, in this state the right to trial by jury in a criminal case may be waived only "by the consent of both

parties, expressed in open court by the defendant and his counsel, . . ." (Cal. Const., art. I, § 7.) Further, the United States Supreme Court has declared that it finds "no constitutional impediment to conditioning a waiver of this right on the consent of the prosecuting attorney and the trial judge when, if either refuses to consent, the result is simply that the defendant is subject to an impartial trial by jury—the very thing that the Constitution guarantees him." (*Singer* v. *United States* (1965) 380 U.S. 24, 36 [13 L.Ed.2d 630, 638, 85 S.Ct. 783]; see also *People* v. *Whitmore* (1967) 251 Cal.App. 2d 359, 364 [59 Cal.Rptr. 411].) Defendant's argument is thus without merit.

6. *The right to a fair and impartial jury.*

 Defendant contends that he was denied due process of law in his trial on the issue of guilt because certain veniremen who indicated that they could fairly and impartially decide the question of defendant's *guilt* were nevertheless excused from all participation on his jury because of their opposition to the *death penalty*. In effect defendant challenges the constitutionality of the bifurcated trial system in capital cases provided for in Penal Code section 190.1 insofar as it requires that the same jury be used to determine the questions of guilt and penalty.[11] He asserts that considerations of penalty have no place in the *voir dire* examination of veniremen who are to sit on the issue of guilt and that different juries should be used in the guilt and penalty phases. In advancing this argument defendant seeks to avail himself of the language from *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] set out in the margin.[12]

 He also argues that in any event potential jurors were erroneously excused for cause from his jury because they were asked only whether they were opposed to the death penalty

---

[11]Penal Code section 190.1 provides in relevant part: "The guilt or innocence of every person charged with an offense for which the penalty is in the alternative death or imprisonment for life shall first be determined, without a finding as to penalty. If such person has been found guilty of an offense punishable by life imprisonment or death, . . . there shall thereupon be further proceedings on the issue of penalty, and the trier of fact shall fix the penalty. . . . If the defendant was convicted by a jury, the trier of fact [on the issue of penalty] shall be the same jury unless, for good cause shown, the court discharges that jury in which case a new jury shall be drawn to determine the issue of penalty. . . ."

[12]"Even so, a defendant convicted by such a jury [i.e., a jury from which only veniremen were excused for cause who stated that they could never impose the death penalty] . . . might still attempt to establish that the jury was less than neutral with respect to *guilt*. If he were to

and not whether they had "such conscientious opinions [with respect to the death penalty] as would preclude [their] finding the defendant guilty, . . ." (Pen. Code, § 1074, subd. 8.) His point seems to be that such provision is the exclusive ground on which a challenge for cause may be sustained for opposition to the death penalty.[13]

The United States Supreme Court has recently held in *Witherspoon* that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (391 U.S. at p. 522 [20 L.Ed.2d at p. 784].) In other words, before a state may execute a defendant it must appear that the only veniremen who were excluded because of their opposition to the death penalty were those "who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*." (Original italics.) (391 U.S. at pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785].)

 The high court indicated that it could not conclude either from the record before it or as a matter of judicial notice "that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." (391 U.S. at p. 518 [20 L.Ed.2d at p. 782].) In other words, in the absence of evidence, the court refused to pass on the question of whether jurors properly excused because of their views on the death penalty were nevertheless "prosecution prone" on the issue of guilt. (See fn. 12, *ante*.) Defendant asserts that

---

succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. That problem is not presented here, however, and we intimate no view as to its proper resolution." (391 U.S. at p. 520, fn. 18 [20 L.Ed.2d at p. 784].)

[13]Penal Code section 1074 provides in part: "A challenge for implied bias may be taken for all or any of the following causes, *and for no other*: . . . 8. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror." (Italics added.)

the answer to this question must be in the affirmative and that separate juries must be used in the guilt and penalty proceedings in order to insure a fair trial.

We have recently held that the mandate of Penal Code section 190.1 requiring the same jury to be used in both the guilt and penalty phases of the trial whenever possible, "neither denies the defendant due process of law nor favors the prosecution over the defense." (*People* v. *Gonzales* (1967) 66 Cal.2d 482, 498 [58 Cal.Rptr. 361, 426 P.2d 929].) The defendant in that case argued, as does defendant herein, that separate juries should be chosen for the guilt and penalty phases and that jurors indicating that they can fairly and impartially decide the question of guilt should not be excused because of their inability to impose the death penalty. We held that the " 'legislative preference for the same jury at both trials deprives the defendant neither of due process nor of the right to an impartial jury. Since all of the evidence properly introduced at the trial on the issue of guilt is relevant in determining the penalty (Pen. Code, § 190.1), having the same jury avoids repetition of evidence and is thus not an arbitrary requirement.' " (*People* v. *Gonzales, supra,* 66 Cal.2d at p. 499.) Defendant has presented no factual evidence which would persuade us to reach a result different from that stated in *Gonzales.* That case fully disposes of his argument that separate juries are required.

We also find without merit defendant's contention that Penal Code section 1074, subdivision 8, prevents the exclusion for cause of veniremen who cannot impose the death penalty, but who are nevertheless able impartially to determine the issue of guilt. We held in *People* v. *Riser* (1956) 47 Cal.2d 566, 576 [305 P.2d 1] (overruled on other grounds, *People* v. *Morse, supra,* 60 Cal.2d 631, 649), that "[i]t would be doing violence" to the purpose of Penal Code sections 1074 and 190[14] to allow such jurors to serve since they would be unable to exercise any "discretion" whatsoever with respect to penalty. (See *People* v. *Gonzales, supra,* 66 Cal.2d at p. 497.) Thus, assuming that the jurors otherwise met the standards for exclusion for cause under *Witherspoon* they were properly excused despite their ability to fairly and

[14]Penal Code section 190 provides in part: "Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the *discretion* of the court or jury trying the same, and the matter of punishment shall be determined as provided in Section 190.1, . . ." (Italics added.)

impartially determine defendant's guilt. We therefore find no error requiring the reversal of defendant's conviction.

Although we conclude that the judgment insofar as it relates to guilt must be affirmed, nevertheless under the compulsion of *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, we must accord defendant a new trial on the issue of penalty.

Our examination of the instant record convinces us that one of the veniremen was excluded from the jury in violation of the mandate of the United States Supreme Court found in the above cited case. We set forth below[15] the relevant portion of venireman Densil Russell's *voir dire* examination. While Russell indicated that it would be difficult for him to impose the death penalty, it is beyond question that he at no time made it

---

[15]"Q [defense counsel] Mr. Russell, you have heard the questions I put to the other people here? A Yes. Q Reserving for the moment this question about your feelings about the death penalty, would you answer the other questions substantially as the others have? A Yes, I would. Q Any differences at all? A No, there wouldn't be any difference. Q Now, let me get into that one. A Well, the death penalty, it would be difficult for me to vote for the death penalty. I am going to be honest, because I just can't make up my mind on it. Q I am sure it would be difficult for most people, Mr. Russell. Do you think it would be impossible? A I am almost sure it would be. I don't think that I could make the decision fairly. I really, down deep in my conscience right now, I could vote for the guilty or whether not guilty, but when it comes to the punishment I think I would have difficulty in doing that. Q I am sure I would, too, but again let's go to the question of whether or not you feel that in a proper case you could or whether in all cases you would find it impossible for you to do it. A I doubt very much whether I could."

"Q [by deputy district attorney] But we do want people, and the law says we are entitled to people, who can say that in a proper case, whatever that be, 'I can vote for the death penalty,' and, of course, once you are sworn in this particular case it's too late for anybody to do anything about it. In other words, we want to know now, and that's why we are asking these rather probing questions about the death penalty at this point rather than sometime later. And I want you right now— and I realize that this has been sort of sprung on you unexpectedly today when you came to your jury duty this morning, and I am sure this was probably the last thing you thought you would probably be faced with— but if you would try to project yourself at this time some four or five weeks from right now and face the prospect that you may be having to decide whether Vassie Washington should live or die, I want to ask you whether or not you feel that if you felt this was a proper case for the imposition of the death penalty that you could so vote. A Well, I don't believe I could, so I would rather be excused, if I could. I don't think I could. Q Could you, under any circumstances, vote for the death penalty in a murder case? A I don't think I could in this frame of mind I have right now. Like I say, I am not fully decided yet. I wouldn't want to tell you I would, so that's the way I feel. Q Do you feel because—and you are the only one that knows what's going on up here as far as you are concerned— A That's right. Q Its awfully hard by a few questions for Mr. Cullum and myself and the Court to try to find out exactly how you feel about some of these subjects, but do you feel that, having in mind that both the People and the defendant are entitled to the type of juror that I described, do you feel you would be biased in favor of the

"unmistakably clear . . . that [he] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [him] . . . ." (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) On the contrary, Russell stated that he was not "fully decided" as to whether he could vote to impose the death penalty. *Witherspoon* admonishes that "a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death." (391 U.S. at p. 519 [20 L.Ed.2d at p. 783].) In discharging our responsibility to see that this guaranty is preserved we must determine whether or not "each juror excused for cause" (*People* v. *Teale, supra,* 70 Cal.2d 497, 515) has expressed with the requisite clarity his position with respect to the imposition of the death penalty. Russell's indecision did not disqualify him under *Witherspoon* from participating in the deliberations as to what punishment defendant should have been given.[16] We are not permitted to say this makes no or little difference. *Witherspoon* directs us to order that defendant be given a new penalty trial.[17]

### 7. *Issues on retrial.*

Certain of defendant's other assertions of error in the penalty phase require our attention for guidance of the court upon retrial.

 Evidence of prior crimes committed by defendant was introduced in aggravation of the penalty. (Pen. Code, § 190.1.) Defendant complains that as to at least one of these crimes "there was no proper identification of appellant as the person who committed the crime" because the testimony of an accomplice was corroborated only by hearsay evidence

---

defendant on life imprisonment and against the People on the death penalty phase of this case? A I think I would."

"MR. TRAMMELL [deputy district attorney]: Your Honor, I would then exercise a challenge for cause based on his actual bias. He is a conscientious objector to the death penalty."

"THE COURT: Thank you, sir. You may be excused as a juror."

[16]We should make clear that this is through no fault of the trial judge since the case was tried before *Witherspoon.*

[17]Defendant asserts that the death penalty is unconstitutional and incorporates by reference the arguments advanced by the briefs in *In re Anderson* and *Saterfield* (1968) 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117]. This argument has been rejected by us in *Anderson* and *Saterfield.*

admitted for substantive use in violation of the rule of *People* v. *Johnson, supra,* 68 Cal.2d 646.

The prosecution introduced the testimony of a number of victims of a series of robberies committed on the night of April 13, 1955. These witnesses identified the robber's car as a 1946 or 1947 black coupe with lowered exhaust pipes and identified defendant as one of the robbers, who was wearing a red shirt. In addition, the prosecution called Ernest McBride, an accomplice in the series of robberies, who testified that defendant was one of the participants, that the group was driving a car similar to the one described by all of the witnesses and that he thought defendant committed a robbery in the area in which the crime here involved was committed.

Mrs. Ida Castleman was one of the victims of the robberies. However, she was dead at the time of trial and the evidence concerning the robbery was elicited from the witness Dunn. He stated that while he was in his house he heard a thud against the side of the building adjoining an alley. On investigation, he found Mrs. Castleman lying in the alley against the house and he saw a 1946 or 1947 dark Plymouth with lowered pipes being driven away. Mrs. Castleman had no purse with her and Mr. Dunn took her to her daughter's house. Mrs. Waller, the daughter, testified that Mrs. Castleman had a purse when she left the house but had none when she was brought home by Mr. Dunn. When she arrived home Mrs. Castleman was "nerved up and shaken, she was just waxen." Over a hearsay objection Sergeant Decker was allowed to testify that Mrs. Castleman told him on the night of the robbery that she was attacked by a male person wearing a red shirt. The testimony was admitted as a spontaneous declaration under Evidence Code section 1240.

In *People* v. *Varnum* (1967) 66 Cal.2d 808 [59 Cal.Rptr. 108, 427 P.2d 772], we held that it was error in the penalty trial for the court to have admitted the uncorroborated testimony of an accomplice as the sole evidence of prior crimes of the defendant sought to be admitted in aggravation of the penalty. We stated that ''Penal Code section 1111,[18] prohibiting proof of an earlier crime by the uncorroborated testimony of an accomplice, also applies at the trial on the issue of penalty.'' (66 Cal.2d at p. 815.) Defendant seeks to bring

---

[18]Penal Code section 1111 provides in part: ''A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. . . .''

himself within this rule by contending that the only corroboration of McBride's testimony that defendant perpetrated the robbery of Mrs. Castleman, consisted of Mrs. Castleman's spontaneous declaration introduced through the testimony of Sergeant Decker. He asserts that the spontaneous declaration exception to the hearsay rule is unconstitutional under the rationale of *Johnson* and therefore there was no corroboration of McBride's testimony.

We believe that there was ample corroboration of McBride's testimony apart from the spontaneous declaration of Mrs. Castleman and in light of our reversal herein we therefore need not reach the question of whether Evidence Code section 1240 is unconstitutional. Numerous witnesses identified defendant as a participant in similarly perpetrated robberies on the same night as the Castleman robbery and in the same vicinity. Mr. Dunn's identification of the car being driven away from the scene matched the description of the car given by other victims as the one in which defendant was riding. This evidence provides sufficient corroboration of McBride's testimony and links defendant to the Castleman robbery. No error of the type condemned by *Varnum* occurred.

Defendant also contends that the testimony of Mrs. Pappas, another victim of a robbery on April 13, 1955, was highly prejudicial and should have been excluded. She identified defendant as her assailant and testified that during the course of the robbery defendant put his hands down her brassiere and on her legs while he was allegedly looking for money. Mrs. Pappas then kicked defendant and he jerked her neck causing an injury. In argument to the jury the prosecutor stated that defendant was not satisfied with just taking Mrs. Pappas' money, "he decides he wants to get a sexual thrill out of the whole thing and he starts to fondle her private parts, . . ." Defendant argues that the comment concerning sexual thrills was wholly outside the record and that the above-detailed portion of Mrs. Pappas' testimony was highly prejudicial.

Evidence of prior crimes committed by the defendant is relevant and admissible in the penalty phase of the trial under Penal Code section 190.1 if those crimes are proved beyond a reasonable doubt (*People* v. *Polk* (1965) 63 Cal.2d 443, 450-451 [47 Cal.Rptr. 1, 406 P.2d 641]; *People* v. *Terry* (1964) 61 Cal.2d 137, 149, fn. 8 [37 Cal.Rptr. 605, 390 P.2d 380]) and if the evidence is not so inflammatory as to out-

weigh its probative value. (See *People* v. *Love* (1960) 53 Cal.2d 843, 856 [3 Cal.Rptr. 665, 350 P.2d 705].)

It was proper for the jury to know the circumstances of the robbery of Mrs. Pappas including the way defendant treated her. From our reading of the record, however, it appears that there was no evidence that defendant was seeking a sexual thrill and it was therefore improper for the prosecutor to make this prejudicial argument to the jury.

Nor do we believe that there was error in the introduction of documentary evidence of defendant's previous conviction for possession of marijuana. Penal Code section 190.1 permits the introduction of evidence in the penalty trial of defendant's background and history and pursuant thereto we have held admissible "[r]ecords and reports, which meet the test of competency, disclosing defendant's past conduct, . . ." (*People* v. *Terry, supra,* 61 Cal.2d at p. 144 and fn. 3.) There was nothing prejudicial in the admission of this evidence; the fact that it did not relate to the crime with which defendant was charged did not make it irrelevant. (See *People* v. *Mitchell* (1966) 63 Cal.2d 805, 816-817 [48 Cal.Rptr. 371, 409 P.2d 211].)[19]

Defendant contends that testimony of Vernie Washington given for the prosecution in the penalty phase was erroneously admitted. Vernie testified that she was at the Long Beach police station when defendant was brought in under arrest at 4:30 a.m. on November 27. Defendant stated to her: "What's this mess you got me into? I should have done it to you." At trial defendant objected to the introduction of this testimony on the grounds that it did not constitute an admission and that it should have been introduced in the "case in chief."[20] The objection was overruled. He now asserts that such evidence constituted "sandbagging" by the prosecutor in that he withheld evidence from the guilt phase

---

[19]We also reject defendant's contention that the "giving of the complex and enormous quantity of instructions on the elements of the alleged [prior] crimes . . . was highly inflammatory and prejudicial in itself." Since it was the burden of the prosecution to prove those crimes beyond a reasonable doubt it was proper for the jury to be instructed on the elements thereof so as to determine if the prosecution met its burden of proof. Nor may defendant raise the remoteness of the offenses of April 13, 1955, since in the penalty proceedings evidence of all of defendant's background and history is relevant on the issue of penalty.

[20]Defendant's counsel was apparently referring to the guilt phase of defendant's trial as Vernie's testimony was introduced during the prosecution's case in chief in the penalty phase.

for introduction in the penalty phase where it was highly prejudicial.

We do not agree. Whether or not the statement made to Vernie was an admission by defendant, it indicated that he was without feelings of guilt or remorse for the arson which he committed which eventually resulted in the death of Tijuana. This type of evidence has been held admissible under Penal Code section 190.1. (See *People* v. *Tahl* (1967) 65 Cal. 2d 719, 735 [56 Cal.Rptr. 318, 423 P.2d 246].) ▮▮▮ We know of no rule which requires the prosecution to present all of its evidence relevant to the crime charged during the guilt phase of the trial. The rule requiring evidence of guilt to be presented in the prosecution's case in chief rather than on rebuttal (see *People* v. *Rodriguez* (1943) 58 Cal.App.2d 415, 418-419 [136 P.2d 626]) does not require all evidence of guilt to be presented in the guilt phase of the bifurcated trial provided for by Penal Code section 190.1. (*People* v. *Corwin* (1959) 52 Cal.2d 404, 406 [340 P.2d 626].)

▮▮▮ Finally, we deal with two instructions requested by defendant and refused by the court. Defendant requested that the jury be instructed that "[s]ympathy for the defendant or for his family is one of the factors which you may properly take into consideration in assessing penalty in this case." The instruction was properly refused. We held in *People* v. *Anderson* (1966) 64 Cal.2d 633, 641 [51 Cal.Rptr. 238, 414 P.2d 366], that it was error for the court to instruct the jury at the penalty phase that it may not be influenced by pity or sympathy for the defendant. (See also *People* v. *Polk, supra,* 63 Cal.2d 443, 451.) However, "[t]o hold a negative instruction improper is not to require that the same instruction be tendered in the affirmative." (*People* v. *Hillery* (1967) 65 Cal.2d 795, 807 [56 Cal.Rptr. 280, 423 P.2d 208].) The jury was properly instructed that the law "commits the whole matter of determining which of the two penalties shall be fixed to the judgment, conscience and absolute discretion of the jury."

▮▮▮ The court also refused to instruct that if the jury "have any doubt at all of the guilt of the defendant of first degree murder [they] may take that doubt into consideration as a mitigating factor in determining the penalty." This refusal was proper. ▮▮▮ We have held that the jury should be instructed "that there is no rule of law which suggests that the punishment should be death unless there is evidence of extenuating or mitigating circumstances nor does

the law suggest that the penalty shall be life imprisonment unless there is evidence in aggravation of the offense; . . ." (*People* v. *Friend* (1957) 47 Cal.2d 749, 767 [306 P.2d 463], overruled on other grounds, *People* v. *Morse, supra,* 60 Cal.2d 631, 649.) ■■■ "[T]he jury must decide the question without benefit of guideposts, standards or applicable criteria; . . ." (*People* v. *Terry, supra,* 61 Cal.2d 137, 154.) ■■■ The jury herein was instructed in accordance with the first of the two above-quoted principles; to have instructed them as defendant requested would have violated the second principle by injecting a criterion for the exercise of their discretion. Both instructions were properly refused.

The judgment is reversed insofar as it relates to penalty; in all other respects the judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

McCOMB, J.—I would affirm the judgment in its entirety. (See art. VI, § 13, Cal.Const.)