[Crim. No. 6224. In Bank. Feb. 18, 1959.]

THE PEOPLE, Respondent, v. CHARLES EVAN
TURVILLE, JR., Appellant.

[Crim. No. 6249. In Bank. Feb. 18, 1959.]

THE PEOPLE, Respondent, v. LAMAR MITCHELL,
Appellant.

624

Morris Lavine, under appointment by the Supreme Court, and William L. White for Appellants.

Edmund G. Brown, Attorney General, William E. James, Assistant Attorney General, William B. McKesson, District Attorney (Los Angeles), Lynn Compton and Jack Kirschke, Deputy District Attorneys, for Respondent.

McCOMB, J.—Defendant Turville, aged 22, was found guilty of first degree murder, and the jury fixed the penalty at death. His appeal is automatic, pursuant to section 1239, subdivision (b), of the Penal Code.

Defendant Mitchell, aged 17, was found guilty of first degree murder and sentenced to life imprisonment. He appeals from the judgment and the order denying his motion for a new trial.

Viewed in the light most favorable to the People, the record discloses the following facts:

On August 26, 1957, the victim, Milo S. Smith, was an attorney in San Pedro. His practice dealt with criminal cases to a certain extent, and a number of his clients were Negroes. He was well known in the San Pedro area, having practiced there for over 30 years. At the time of his death he was 55 years old, 5 feet 8½ inches in height, and weighed about 197 pounds.

His suite of offices was located on the second floor of a two-story building on Pacific Avenue. An alley ran along the back of the building, with a parking area in the rear. There were doors and stairways in both the front and rear of the building giving access to the second floor.

The suite consisted of several rooms. One was a large room known as the workroom or library, where Mr. Smith and his secretary, Mrs. Knutson, worked. Adjoining this at one end was a room known as the "morgue," in which were filing cabinets, a refrigerator, and a closet. In this closet Mr. Smith kept his entire wardrobe, including a number of ties which hung from a rack on the inside of the door. Thirty-five to forty-five pairs of shoes were kept on top of the filing cabinets. Adjoining the workroom at the other end were a combination kitchen and bar, and a rest room.

Across the hall from the workroom were three other rooms, including Mr. Smith's private office, or consultation room, with windows overlooking Pacific Avenue. This office contained, among other things, a desk, a large table, and an upright safe.

Mr. Smith wore bifocal glasses. Even with his glasses, he could not see the dial to open the safe, and, to the knowledge of his secretary, he had not opened the safe during the nine years she had been in his employ. In September 1956 the combination to the safe had been changed, and his secretary had typed the new combination on a small slip of paper, which he carried in his billfold.

Mr. Smith was in the habit of carrying large sums of money on his person. In his hip pocket he carried a billfold containing identification cards and from $1,000 to $2,000 in large bills. In his front pants pocket he carried a leather money

clip, which ordinarily contained bills of $20 or less. He also carried in his inside coat pocket a secretary-type wallet containing a note pad and pencil, but his secretary had never known him to carry money in it.

After locking the office at approximately 5:15 p. m. on August 26, 1957, Mr. Smith and Mrs. Knutson went to a nearby cocktail lounge, where they remained for about an hour. Smith was wearing a dark blue suit and a white short-sleeved shirt. Before leaving the office he had removed his tie and placed it in his pocket. Mrs. Knutson observed that Smith was wearing his wrist watch and a diamond ring and that he had a substantial amount of money in his money clip, including several $50 bills. His name was engraved on the back of his wrist watch.

About 6:30 p. m. Mrs. Knutson and Smith separated. He drove to the home of a client, Mrs. Helen Seal, in the Palos Verdes area of Los Angeles County. Subsequently, in the company of Mrs. Seal's son Michael, he returned to the San Pedro area, where the two of them visited several bars. Around 2 a. m. on August 27, 1957, they met defendants on the corner of Fifth and Beacon Streets in San Pedro. Smith gave defendant Turville $20 to purchase a bottle of whiskey for him. Turville returned and said he could not get any liquor and offered the bill back to Smith, but Smith told him to keep it. Defendants suggested that it would be wiser to drive around in Smith's car than to stand on the street. Smith, Seal and defendants then drove to Smith's office in his car.

On arriving at the office, they parked the car in the rear of the building, and the four entered Smith's offices by the rear door and stairway. Smith showed the party through the offices and after some conversation gave defendant Mitchell some shoes. He then called a cab driver friend, who brought a bottle of whiskey to the office. He invited the driver to the office for a drink, but the invitation was declined.

After some drinking and conversation in the office, Seal departed, driving Smith's car, and returned to his home, where he arrived about 3:20 a. m. Shortly before this time, Smith telephoned Mrs. Seal to inquire about his car. About 3:30 a. m. he again called Mrs. Seal, and learning that his car was at her home, he instructed her that it be left in the driveway and said he would pick it up later. About 4:57 a. m. he called for a cab to be sent to his office. The cab was dispatched but returned without a fare.

About 5:20 a. m. the dispatcher of the cab company received

another call asking that a cab be sent to Smith's office, but the person who made this call was not Mr. Smith.

About 5:21 a. m. Chester Burns, a cab driver, drove up in front of Smith's office and observed lights in the office. He honked his horn, got out of the cab, entered the front of the building, and went to the door of Smith's office. While outside the door, he heard someone opening and closing desk drawers, but when he knocked on the door the noise ceased. No one answered the door and he departed. As he left the building, he stumbled over two or three pairs of Smith's shoes at the foot of the front stairs. While getting into his cab, he looked up at the windows of the office and observed a person who appeared to be watching him. This person was not Smith.

At 7:50 a. m. Mrs. Knutson entered the building through the rear door and stairway and came into the office through the "morgue" room. She observed that the closet door was open and that the ties had been disturbed. She went to Smith's private office and found his body lying face upward with a necktie around his throat. The necktie was the one he had taken off and put into his pocket the preceding evening. The blue pants and coat that he had been wearing were cast to one side on the floor, and his billfold was lying open and empty on the table back of his desk. His glasses were lying on a shelf in another room some distance from the body. A .45 automatic, which was kept in the desk in his private office, was missing. The facing was broken off the drawer of the secretary's desk, and five pairs of Smith's shoes were gone.

The police entered the building through the front entrance at approximately 8 a. m. At the foot of the stairs they found a soiled towel but no shoes. They observed a souvenir rifle, broken in two parts, lying near the body. A telephone, with the receiver broken but resting in the cradle, was on the floor. Smith's secretary-type wallet was lying on the floor behind the desk, and a paper containing the combination to the safe was on the floor.

The investigating officers found a bloody footprint near the safe, blood on the safe, and a bloody mark in front of it, as if someone with blood on his knee had knelt there. A small saucepan of water was sitting by the victim's head, and there was a small wooden gavel partially under the body. Blood and water were mixed on the carpet. The blood was the same type as Smith's. When the officers turned Smith's body over, they found that his hands were tied behind his back with a

necktie. There was broken glass on the floor of the workroom, but aside from the fact that the telephone in the room where the body was found was broken, there was no evidence of a struggle in the offices. Smith's money, watch and ring were missing.

Fingerprints and palm prints of both defendants were found throughout the offices, specifically on the broken telephone, the top of the desks, the filing cabinets, and the closet door.

The autopsy surgeon testified that in his opinion the victim had died between 4:47 and 6:47 a. m. on August 27, 1957, and that the cause of death was massive internal hemorrhage from a rupture of the mesentery. There were 55 external wounds or groups of wounds on the body, the entire rib cage was fractured and compounded externally, and the ligature around the neck had been applied with sufficient force to fracture the hyoid bone and to produce discoloration in the skin of the neck. In the autopsy surgeon's opinion, Smith had been garroted and his injuries were extremely painful and had been inflicted after his hands had been tied behind his back and apparently while he was conscious.

On August 29, 1957, defendant Turville was arrested at the home of his aunt in Brooklyn, New York, by two agents of the FBI. At the time of his arrest he was wearing Smith's watch and ring. He was taken to the New York office of the FBI, where he orally confessed to the murder and then signed a 12-page written confession containing the same matters as the oral confession. Before he was questioned by the agents of the FBI, he was advised of his constitutional rights. On the following morning he was arraigned on a federal warrant before the United States Commissioner.

In his confession Turville stated that he and Mitchell had gone to Smith's office during the early morning hours of August 27 at Smith's invitation. Smith had given Mitchell a couple of pairs of shoes, which Mitchell subsequently placed at the foot of the front stairs of the office. Afterward he and Mitchell returned to the suite of offices, and when Smith went to the rest room, they agreed to rob him and force him to open the safe.

Turville further stated that the two of them forced Smith to the floor and removed the money from his pockets. They then carried him into Smith's private office and set him opposite the safe and ordered him to open it. When he refused, the two of them administered ''judo chops'' to his

sides, and when Smith tried to crawl out of the office, Mitchell struck him across the head with the rifle. They revived him with water, placed a gag in his mouth, and told him to write the combination to the safe on a piece of paper. When Smith refused, they beat him some more and went through his wallets, finding a couple of combinations, which they tried on the safe without success. When Smith appeared to be dead and they were unable to revive him, Mitchell endeavored to wipe their fingerprints from the office with a towel, and Turville took Smith's watch and ring.

Turville further stated that the two men then left the office by way of the front stairs, picked up the shoes at the foot of the stairs, and walked to downtown San Pedro, where they separated. Before separating Mitchell gave him two $100 bills, half of the four $100 bills taken from Smith's pockets.

He further stated that he met Betty Lou Page on the street in San Pedro, and she drove him to Palm Springs, where he endeavored to get a plane to New York. Failing this, he returned to International Airport in Los Angeles and on the following morning flew to New York City and went to the home of his aunt.

Following his confession to the FBI agents, Turville directed them to his luggage, which contained the clothing he had worn on the night of the murder. From the luggage the agents recovered a pair of pants with a large bloodstain on the knee, blood on the cuff, and blood inside the pockets. The blood was type $O,$ which was the same blood type as that of the victim. The agents also recovered the .45 automatic that had been taken from Smith's office.

Thereafter, in New York, Turville repeated to an officer of the Los Angeles Police Department and a representative of the Los Angeles County District Attorney's office the statements he had made to the FBI agents. In addition, he stated that during the course of the robbery he had taken Smith's pants off so that he would not run into the street and call the police.

On September 3, 1957, he was taken before a Supreme Court judge of the State of New York, where he was again advised of his constitutional rights. He waived extradition proceedings and was returned to Los Angeles on September 4, 1957. There he repeated his confession to Lt. Weyant of the Los Angeles Police Department.

Defendant Mitchell was arrested in Los Angeles on the night of August 29, 1957. At that time he had in his possession $290, which included two $100 bills that he had attempted to conceal in the waistband of his trousers.

Shortly after his arrest, there was a conversation between Mitchell and police officers at the police station in San Pedro. His statements were made freely and voluntarily and without the use of any threats or force or any promise of reward or immunity. He stated that the money in his possession had been saved from his earnings, or he had won it at a poolhall in Watts, where he had been playing for $25 a game, and that on the evening of August 26 and the early morning of August 27, 1957, he had been at home. He was then informed that his father had told the officers that he had left home around 8 o'clock in the evening on August 26 and had not returned until the following morning around 7 or 8 o'clock, and that other witnesses had seen him on Beacon Street that evening and early morning in the company of two white persons, one being Milo Smith, and another colored fellow. In response to this statement, Mitchell said, ''Yes, I was with him, but I went home early.''

Mitchell then related occurrences on the evening of August 26 and the early morning of the 27th. He admitted meeting two ''white studs,'' an older one ''between 45-50'' and a young one introduced as ''Mike, Jr.'' who appeared to be 18 or 19. He said that another colored fellow, known to him as Johnny Blessay (defendant Turville), joined them and they went to Smith's office on Pacific Avenue.

He further stated that after Mike Seal had departed, Smith called home in regard to his car and said he would be there in a cab to pick it up. Smith then started to dial for the cab company, and he (Mitchell) put his finger on the button on the phone to stop him from calling. When asked why he did that, he stated: ''Well, I thought this guy was the police, all evening long. When we first met these guys, I had an idea they were the police and I was going to wind up in jail.'' Mitchell then obtained the number of the cab company from Information, dialed the cab company, and permitted Smith to order a cab. Turville at that time was listening in on another telephone. After waiting a while, Mitchell walked down to see whether the cab was coming. When it did not arrive, he returned to the office, again telephoned for a cab, and waited a while longer. When the cab did not arrive, he and Turville left the office about 3:18 a. m.

Mitchell was told that he was not telling the whole truth about the matter and that Turville had been picked up in New York and had implicated him. He was shown a newspaper indicating that Milo Smith's murderer had been arrested in New York.

Mitchell then said he would tell the whole truth and stated that his codefendant had taken a tie, grabbed Smith, forcing him to the floor, and went through his pockets. His codefendant pulled out Smith's wallet and the money out of his money clip and handed them to him. His codefendant then got Smith on his feet, took him to the other room, and tried to get him to open the safe. This was done by his codefendant's giving Smith "judo chops" and hitting him all over the head and body and kicking him in the stomach and chest. He (Mitchell) gave Smith artificial respiration and told his codefendant to let him alone. While his codefendant was still trying to get Smith to write down the combination to the safe, Mitchell went out to the refrigerator, and when he came back Smith was lying face down on the floor. His codefendant was pounding Smith's face against the floor, pounding his head with the telephone, and hitting him with the gavel to persuade him to open the safe. Mitchell heard the cab pull up and went to the windows to see whether the cab had gone.

He further stated that Smith lost consciousness more than once as a result of the choking. After breaking into one of the desks in another room, Mitchell returned to the private office, where Turville, who had found the combinations to the safe in Smith's wallet, was trying to open the safe. Smith was lying on the floor on his back with his eyes open, and he (Mitchell) thought he was all right, but when he listened he could not hear him breathing. He did not know whether Smith was dying or not, and he and Turville then left. He said that Turville had given him the two $100 bills which he was carrying at the time of his arrest, but that the remainder of the money he had was his.

■ *Questions*: First. *Was the evidence sufficient to support the verdicts finding defendants guilty of murder in the first degree?*

*Yes.* The following rules are here applicable:

(1) Murder which is perpetrated by means of torture or committed in the perpetration or attempt to perpetrate robbery is murder in the first degree. (Pen. Code, § 189.)

■ (2) A killing, intentional or otherwise, committed in the perpetration of one of the felonies enumerated in section

632

189 of the Penal Code constitutes murder of the first degree. (*People* v. *Osborn*, 37 Cal.2d 380, 383 [231 P.2d 850].)

██ (3) When a killing is perpetrated by means of torture, the means used is conclusive evidence of malice and premeditation, and the crime is murder of the first degree. (*People* v. *Misquez*, 152 Cal.App.2d 471, 480 [9] [313 P.2d 206].)

██ (4) It is murder by torture where the intent of the defendant was to inflict grievous pain and suffering upon the victim for the purpose of persuasion. (*People* v. *Daugherty*, 40 Cal.2d 876, 886 [7] [256 P.2d 911].)

██ (5) An intent that the deceased should suffer may be inferred from the condition of the deceased's body and the admissions of the defendant. (*People* v. *Misquez*, *supra* at 480 [10].)

██ Applying the foregoing rules to the evidence set forth above, it is disclosed that the victim was killed in the perpetration of robbery and in an effort to extort from him the combination to his safe and that he was tortured with the specific intent that he should suffer. Therefore, there is ample support for the verdicts of the jury that defendants were guilty of murder in the first degree.

██ Second. *Did the trial court err in failing to give requested instructions on the degree of the crime?*

*No.* The trial court instructed the jury as follows: "Although there are two degrees of murder, the evidence in this case is such that either the defendants are innocent of the charge of murder or one or both of them is guilty of murder in the first degree." In addition, the jury was instructed on justifiable homicide in self-defense and the law concerning murder in the perpetration of robbery or attempt to perpetrate robbery.

Turville contends that the trial court erred in instructing the jury that either the murder was in the first degree, or defendants were entitled to an acquittal. This contention is unsound, for the reason that the evidence clearly indicates that there was no tenable theory presented to the court requiring that instructions be given on any lesser degree of homicide. Turville's theory was that he struggled with Smith in defense of his life but that he did not kill him, and that someone else entered the premises after his departure, tied the victim, and killed and robbed him. The theory of the defense presented to the jury was aimed at pointing the finger of suspicion on at least three other persons, Mrs. Knutson, Mike Seal, or a person

or persons unknown. This was developed through the cross-examination of Mrs. Knutson, Mr. Seal, and Mr. Pinker and by calling one of the deputy district attorneys to the witness stand to establish that he was a neighbor of Mike Seal. Concerning this theory presented by Turville, who was the only defendant who testified or presented evidence in his own defense at the trial, on direct examination he stated that the victim was alive when he left and that his hands were not tied. His testimony was that his codefendant could have been the one tying them, because he himself did not do it. However, he testified that his codefendant left before he did.

The evidence pointed indisputably to a homicide committed in the act of committing a felony (robbery) and in torturing the victim with intent that he suffer, so that property could be extorted from him. Under such a state of facts it was proper for the court to advise the jury that defendants either were innocent, or were guilty of first degree murder. (*People* v. *Riser,* 47 Cal.2d 566, 581 [18] [305 P.2d 1] ; *People* v. *Rupp,* 41 Cal.2d 371, 382 [11a] [260 P.2d 1] ; *People* v. *Sanford,* 33 Cal.2d 590, 595 [2] [203 P.2d 534].)

■ Third. *Did the trial court err in not giving an instruction on intoxication, requested by defendant Turville?*

*No.* The testimony presented to the jury, including that of defendant Turville, the only defendant to testify, clearly established that there was no evidence requiring such an instruction. The mere fact that a defendant may have been drinking prior to the commission of a crime does not establish intoxication or require the giving of a requested instruction thereon. (*People* v. *Price,* 207 Cal. 131, 133 [1] et seq. [277 P. 316].)

■ Fourth. *Did the trial court err in failing to instruct the jury, on its own motion, that the case against defendant Mitchell ended when he rested?*

*No.* Mitchell contends that the trial court, on its own motion, should have instructed the jury that the case against him ended when he rested. Mitchell made no request for such an instruction. ■ It is the general rule that in a criminal case a jury should be instructed on general principles of law pertinent to the case. However, this rule is not applicable to specific points developed during the trial, and unless instructions as to these matters are requested by the party desiring them, it is not incumbent on the court to give such instructions on its own motion where the jury is otherwise fully and fairly

instructed on the general principles of law involved in the case. (*People* v. *Klor,* 32 Cal.2d 658, 662 [3] [197 P.2d 705]; *People* v. *Bender,* 27 Cal.2d 164, 175 [2] [163 P.2d 8].)

Fifth. *Did the trial court err in instructing the jury as follows:* "*A prisoner sentenced to either death or life imprisonment may be pardoned or may have his sentence reduced by the Governor. A prisoner serving a life sentence may be paroled but not until he has served at least seven calendar years*"?

*No.* The foregoing instruction was proper. (*People* v. *Ward,* 50 Cal.2d 702, 711 [7] [328 P.2d 777]; *People* v. *Riser,* 47 Cal.2d 566, 583 [21] [305 P.2d 1]; *People* v. *Friend,* 47 Cal.2d 749, 754 et seq. [306 P.2d 463].)

Sixth. *Did the trial court err in instructing the jury as follows:* "*If you should find that a confession or an admission was false in any particular, it remains, nevertheless evidence for your consideration in connection with all other evidence in the case, to be given such significance and weight as your judgment may determine*"?

*No.* In addition to the above instruction, the trial court instructed the jury: "Evidence, if any, that a defendant, on one or more occasions other than from the witness stand, made false, contradictory or misleading statements concerning the charge against him which is now being tried, may be considered by the jury as a circumstance tending to prove a consciousness of guilt, but is not sufficient of itself to prove guilt. The weight to be given to such a circumstance, and the significance, if any, to be attached to it, are matters for the jury to determine."

It is not reversible error to instruct that notwithstanding a jury determines a confession to be false, it remains evidence to be considered under instructions to be given subsequently concerning false statements made by an accused, where a subsequent instruction clearly explains the evidentiary value of false statements and there is ample evidence of guilt apart from the confession, as in the instant case. (*People* v. *Chessman,* 38 Cal.2d 166, 180 [9] [238 P.2d 1001]; *People* v. *Woods,* 35 Cal.2d 504, 510-511 [8] [218 P.2d 981].)

Seventh. *Did the trial court err in refusing to grant defendant Turville's request for the following instruction:* "*The Court instructs the jury that the testimony of a defendant is not to be weighed or deliberated upon differently from that of any other witness; and you must weigh and deliberate as to his testimony by the same rule and in the same*

*manner that you would the testimony of any other witness, in the case"?*

*No.* Defendant Turville argues that because the court gave an instruction on a defendant who did not testify, his requested instruction should have been given. However, it is proper to refuse an instruction that a defendant, having taken the stand in his own behalf, should have his testimony judged by the same rules as the testimony of any other witness. (*People* v. *Hightower,* 40 Cal.App.2d 102, 108 [4] [104 P.2d 378]; *cf. People* v. *Albrexstondare,* 71 Cal.App. 339, 349 [8] et seq. [235 P. 87].)

 Eighth. *Did the trial court err in receiving in evidence the confession of defendant Turville?*

*No.* Turville contends that he was denied due process of law guaranteed by the Fourteenth Amendment to the Constitution of the United States, in that his confession was illegally obtained by FBI agents in New York. The record discloses ample evidence to sustain the jury's finding that the confession was freely and voluntarily made without promise of immunity or hope of reward and that he was taken without unnecessary delay before a United States Commissioner in New York. Under such circumstances, his confession was properly received in evidence. (*Rogers* v. *Superior Court,* 46 Cal.2d 3, 10 [13] et seq. [291 P.2d 929].)

 Ninth. *Did the trial court err in receiving in evidence as against defendant Mitchell the victim's watch, ring, pistol, pair of bloody pants, shoes, ammunition and clip, which were found in the possession of defendant Turville?*

*No.* The jury was fully apprised of the facts concerning the recovery of these items, and they were properly admitted into evidence under the charge contained in the information. They were material to the People's case against both defendants, the evidence revealing that there was a joint criminal venture between them. Further, defendant Mitchell presented no objection in the trial court to the introduction into evidence of these exhibits, and therefore may not for the first time on appeal urge that it was error for the trial court to have received them in evidence. (3 Cal.Jur.2d (1952), Appeal and Error, § 143, p. 609.)

 Tenth. *Was it error, as to defendant Mitchell, for the trial court to receive in evidence (a) his confession and (b) the confession of his codefendant?*

*No.* (a) From the facts set forth above, the confession of

defendant. Mitchell was admissible, since its voluntariness was properly established.

(b) As to defendant Turville's confession, the record discloses that the jury was adequately admonished that this testimony related only to Turville and was not to be considered against Mitchell. It must be presumed that the jury heeded this admonition.

██ Eleventh. *Was the district attorney guilty of misconduct in his argument to the jury?*

*No.* The record discloses that the district attorney was properly urging his points vigorously to the jury. He may use appropriate epithets which are warranted by the evidence, as in the instant case, without being chargeable with prejudicial misconduct. (*People* v. *Wein,* 50 Cal.2d 383, 396 [7] [326 P.2d 457].) ██ Further, defendants are not in a position to object on appeal to the argument of the district attorney, since no objection was made in the trial court. (See *People* v. *Hampton,* 47 Cal.2d 239, 240 [3] [302 P.2d 300]; *People* v. *Byrd,* 42 Cal.2d 200, 208 [3] [266 P.2d 505].)

██ Twelfth. *Did the district attorney commit prejudicial error in arguing to the jury the length of time of service for life imprisonment on the penalty phase of the case as to defendant Turville?*

*No.* Turville alleges that it was error for the district attorney to argue, on the penalty phase of the trial, that life imprisonment did not necessarily mean imprisonment for life. This argument was proper, since the district attorney was correctly stating the law and arguing the facts to the jury under the provisions of section 190.1 of the Penal Code. (See *People* v. *Morlock,* 46 Cal.2d 141, 147 [7] [292 P.2d 897].)

██ Thirteenth. *Is section 190.1 of the Penal Code unconstitutional?*

*No.* Defendant Turville contends that the provisions of section 190.1 of the Penal Code* are ex post facto as to him,

---

*Section 190.1 of the Penal Code provides: "The guilt or innocence of every person charged with an offense for which the penalty is in the alternative death or imprisonment for life shall first be determined, without a finding as to penalty. If such person has been found guilty of an offense punishable by life imprisonment or death, there shall thereupon be further proceedings on the issue of penalty, and the trier of fact shall fix the penalty. Evidence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty. The determination of the penalty of life imprisonment or death shall be in the discretion of the court or jury trying the issue of fact on the evidence presented, and the penalty fixed

in that the crime which he committed occurred prior to the effective date of this section. This contention has been held to be without merit. (See *People* v. *Ward, supra,* 50 Cal.2d 702, 710 [4] et seq.)

 Fourteenth. *Was the trial judge guilty of misconduct in commending the jury at the conclusion of its deliberations on the issue of guilt?*

*No.* Defendant Turville claims that he was denied a fair trial in that at the close of the case on the issue of innocence or guilt, and after the verdict of guilty of murder in the first degree was returned, the trial judge expressed to the jury his appreciation for their services and for their conscientious efforts to arrive at a fair and just verdict. The comment of the trial judge was fair. It did not indicate any preference or belief concerning the penalty to be imposed, which was the only remaining phase of the trial for the jury to consider. In addition, the judge admonished the jury not to consider his comments and informed them that he was not in the slightest degree indicating to them what the penalty should be.

---

shall be expressly stated in the decision or verdict. The death penalty shall not be imposed, however, upon any person who was under the age of 18 years at the time of the commission of the crime. The burden of proof as to the age of said person shall be upon the defendant.

"If the defendant has pleaded not guilty by reason of insanity at the time of commission of the offense, the trier of fact, after the determination of the penalty, shall thereupon determine whether or not defendant was sane at the time of commission of such offense. The provisions of this section shall prevail over any other provision of law with respect to the time of determining the sanity of defendant at the time of commission of the offense. However, if at any time during the trial of defendant, doubt arises as to the sanity of defendant at such time, the question of defendant's sanity shall be determined as provided in Chapter 6 (commencing at Section 1367) of Title 10, Part 2 of this code.

"If the defendant was convicted by the court sitting without a jury, the trier of fact shall be the court. If the defendant was convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived. If the defendant was convicted by a jury, the trier of fact on the issue of penalty and the issue of sanity, if any, shall be the same jury unless, for good cause shown, the court discharges that jury in which case a new jury shall be drawn to determine the issue of penalty, or the issue of sanity or both such issues, as the case may be.

"On such further proceedings on the issue of penalty, any evidence concerning the commission of the crime admissible in the trial determining the guilt of the defendant may be admitted.

"In any case in which defendant has been found guilty by a jury, and the same or another jury, trying the issue of penalty, is unable to reach a unanimous verdict on the issue of penalty, the court shall dismiss the jury and either impose the punishment for life in lieu of ordering a new trial on the issue of penalty, or order a new jury impaneled to try the issue of penalty, and the issue of sanity, if any, but the issue of guilt shall not be retried by such jury."

**Fifteenth.** *Was defendant Turville denied equal protection of the laws when he received the death penalty and his codefendant, because of his age, received life imprisonment?*

*No.* Turville argues that since section 190.1 of the Penal Code excludes from the possibility of the infliction of the death penalty persons under the age of 18 years at the time of the commission of a crime, it denies him equal protection of the laws, as guaranteed by the Fourteenth Amendment of the United States Constitution, and violates the provisions of section 11, article I, of the California Constitution, which provides that all laws of a general nature shall have uniform operation.

There is no merit in this contention. It is established that the legislatures of the several states may classify persons by their age for the purpose of determining the punishment to be inflicted for crimes committed. When the classification is reasonable, as in the present case, and not arbitrary or capricious, there is no constitutional bar to the classification. The presumption is that an act of the Legislature is constitutional. (*In re Spencer*, 149 Cal. 396, 400 [86 P. 896, 117 Am.St.Rep. 137, 9 Ann.Cas. 1105].)

It is likewise settled that where all other persons in the same class as the defendant are subjected to like punishment, there is no denial of equal protection of the laws. (*People* v. *Finley*, 153 Cal. 59, 62 [94 P. 248] ; *cf. People* v. *Smith*, 218 Cal. 484, 488 [5] [24 P.2d 166].) In the present case, all persons in the class of defendant Turville (that is, over the age of 18 years) were equally subject to the imposition of the extreme penalty. The exemption of those under the age of 18 years is reasonable and in accord with well-established legislative policy to treat youthful offenders in a different way. The choice of the age of 18 was within the determination of the legislative function. Therefore, defendant Turville was not denied equal protection of the laws.

**Sixteenth.** *Is there any validity to defendant Turville's contention that the present record on appeal is incomplete and incorrect?*

*No.* Turville fails to direct our attention to any instance wherein the record on appeal is not correct.

**Seventeenth.** *Was defendant Turville denied the right to have counsel of his choice on his motion to correct the reporter's transcript?*

*No.* Turville asserts that the trial court committed prejudicial error in denying him counsel of his choice on his

motion to correct the reporter's transcript. The record reveals that Turville was not denied any right to which he was entitled. His mother engaged private counsel to represent him on the proceedings in question. This attorney was rejected by Turville. The court then made arrangements to have three members of the bar in the area talk with him, with the option in defendant to decide which one the court would appoint. He informed the court that he did not "desire" to make the decision at that time, and the court determined the attorney to represent him by drawing one of the three names from a box.

Mr. Albert C. S. Ramsey, an experienced trial lawyer, was selected. The matter of the corrections was set over to give counsel sufficient time to prepare. At the later date counsel stated he had read the record and was sufficiently acquainted with defendant's position and the contents of the transcript to represent him and proceed. Turville then produced a copy of a "petition for a writ," which he declared he had submitted to the Supreme Court. He also stated that he refused present counsel, claiming that counsel had said he was not interested in representing him in that phase of the case and had known Milo Smith for 20 years.

Mr. Ramsey was sworn and stated that he had been acquainted with the deceased and had known him as a practicing attorney but had had no financial or social relations with him. The record discloses excellent qualifications of Mr. Ramsey to represent Turville, and it is clear that the latter was not denied anything to which he was entitled. (*Cf. People* v. *Tabb*, 156 Cal.App.2d 467, 471 [1] [319 P.2d 656].)

The judgments and order denying the motion for a new trial are affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.

The petition of appellant Turville for a rehearing was denied March 18, 1959.