Filed 5/7/21  P. v. Bagnerise CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TAYLOR CHANEL BAGNERISE,<br><br>    Defendant and Appellant. | B300334<br><br>(Los Angeles County<br>Super. Ct. No. BA446041) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed and remanded with directions.

Jin H. Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Joseph P. Lee and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Taylor Chanel Bagnerise was found guilty by a jury of the second-degree murder of Devon McConnell.  The jury found that appellant had used a deadly weapon, namely, a knife, in the commission of the murder.

Probation was denied and appellant was sentenced to a term of imprisonment of 15 years to life.  The sentence was enhanced by a consecutive one-year term under Penal Code section 12022, subdivision (b)(1) (use of deadly weapon).[1]  The court imposed a number of fines and assessments which are not at issue in this appeal.  Appellant was given 1,198 days of custody credit.  It is conceded that she is entitled to one additional day of credit.

Appellant contends that the court prejudicially erred in failing to instruct the jury on self-defense and in failing to give a voluntary manslaughter instruction based on imperfect self-defense.  We do not agree and affirm the judgment.  We remand with directions to give appellant one additional day of custody credit.

**FACTS**

McConnell was murdered shortly after midnight of April 19/20, 2016.  His murder was preceded by a troubled relationship with appellant of two or more years that appears to have been punctuated by outbursts of violence.

We begin by relating an incident that occurred on May 15, 2015, that provides background on the nature of appellant's and McConnell's relationship.  We go on to summarize alleged previous acts of violence since this evidence arguably bears on the principal issue on appeal, which is the court's refusal to instruct on self-defense.  We relate text messages exchanged between appellant and McConnell two weeks prior to the murder in that this sheds light on the problems of their relationship and tends to explain their final and fatal confrontation.  We state the facts of the homicide.  We discuss appellant's physical condition after the homicide since this relates to whether McConnell may have been the aggressor.  We detail the results of the autopsy performed on McConnell as this evidence bears directly and convincingly on the issue of self-defense.  We end by briefly referring to the defense's case-in-chief at trial.

---

[1] Statutory references are to the Penal Code.

2

### 1. The May 15, 2015 incident

McConnell and his parents retained criminal defense attorney Michael Kraut on May 27, 2015, to represent McConnell on a single count of felony domestic violence. This charge appears to have been generated by the incident that took place on May 15, 2015. It was Attorney Kraut who related at trial what happened between appellant and McConnell on May 15, 2015.

Appellant and McConnell went out for diner in the evening of May 15, 2015, leaving their recently born child with appellant's grandmother. Appellant wanted to talk about their relationship, but McConnell "did not want to be in the relationship, and she continued to want to talk about it." It was already very late and McConnell wanted to take appellant home so that they could relieve appellant's grandmother. Appellant did not want to go home. She started to argue and "then started to get aggressive." As McConnell was driving, appellant was punching and trying to scratch him. They arrived at the grandparents' home and McConnell got out and went to ring the doorbell to ask the grandparents for help. Appellant told him not to ring the doorbell. She did not want to stop talking about their relationship and told McConnell that if he rang the bell, she would hurt herself. He did ring the bell, and heard the noise of a pot breaking. He turned around. He saw a clay pot about a foot and a half that was cracked. Appellant had some cuts on her face and forehead.[2]

After appellant's grandfather opened the front door, McConnell said, "Look what she just did." With that, McConnell left and proceeded to the Carson sheriff's station. McConnell called 911 (it is unclear whether he called from the sheriff's station), stating that he wanted to report an incident. McConnell told the dispatcher that he was being beaten and that appellant was threatening to kill him; that with each incident appellant was getting more violent; that he was scared of her and wanted the grandfather to intervene. At some point during these events appellant called the police, stating that McConnell had assaulted her.

---

[2] Around 4:30 a.m. on May 16, 2015, appellant was treated in a medical emergency room for a laceration of her right eyebrow, which took two stiches, and for a laceration of one centimeter on her right cheek. The emergency room physician did not see any bruises, swelling, or other injuries.

In September 2015, the prosecution reported that it was unable to proceed with the case against McConnell. Attorney Kraut's motion to dismiss the case was granted.

### 2. Previous acts of violence

Appellant refers to three acts of prior violence by McConnell which appellant contends bear on the reasonableness of her perception of the danger that McConnell posed. These were related by appellant to Deputy Sheriff Porsche Heisser.

According to Heisser, appellant told her that appellant had experienced violence at McConnell's hands around Christmas 2014 when she was pregnant. There was another incident in January 2015 when McConnell was aggressive with appellant. The third incident was at McConnell's house when she tried to use his duffel bag for her belongings. He snatched the bag, dumped her stuff, and told her she was not leaving his house with his bag. He next pushed her against a dresser, bruising her leg.

The first two incidents were described only in conclusory terms. Appellant, in a later conversation with a sheriff's detective, withdrew the third incident as inaccurate and as not having occurred.

Appellant also cites the testimony of Francisco S., a neighbor of appellant's, who testified that he regularly heard appellant and a man arguing and appellant crying. Sometimes he heard banging on the wall, which he described as sounds of a struggle.

The record also contains reports of acts of violence by appellant. The persons testifying to these acts were Attorney Kraut and Deputy Sheriff Heisser. Both of these witnesses related information conveyed to them by McConnell. We prefer to deal carefully with these accounts. This is not because we question the credibility of these witnesses, which we decidedly do not, but because these accounts ultimately involve McConnell's credibility. Without burdening the record with a rather tawdry series of scenes, we take away from these accounts that angry confrontations were not uncommon between appellant and McConnell.

4

### 3. The text messages

Text messages exchanged between McConnell and appellant in the two weeks prior to the murder reflect the issues that appellant and McConnell were unable to resolve.

On April 5, 2016, appellant texted McConnell that she had to raise their infant daughter alone, and that she needed McConnell but he wasn't there. McConnell replied that she had injured herself, lied that he had done it, and pressed charges for something he did not do. Appellant texted that there was "nothing in place for visitation so if you want to see [the baby] we need to discuss things or go back to court." On April 8, 2016, in a failed attempt to patch things up, they exchanged texts about going to Las Vegas to celebrate appellant's birthday. On April 15, 2016, appellant wrote that McConnell was hardly seeing his daughter anymore and that he was hardly around. McConnell replied, "I have been giving it my all, and I'm not going to be the only one doing so anymore," and as a result of what she did, they had been separated for nine months. On April 17, 2016, appellant wrote, "I have many people that can testify in court that you have not been taking care of [the baby] or supporting her in anyway." In the end, appellant agreed that McConnell could visit their daughter between 5:00 and 7:30 p.m. on April 19, 2016. This was the visit that ended McConnell's life.

### 4. The homicide

Q.N., a friend of appellant's, visited appellant's apartment around 4:00 p.m. on April 19, 2016. Appellant told Q.N. that she wanted to go to Las Vegas with McConnell for her birthday. Appellant spoke of some custody issues regarding her daughter, voicing concerns that McConnell would take her daughter away from her.

McConnell arrived at the apartment around 5:00 p.m. There was nothing unusual about McConnell as he came into the apartment. McConnell asked where his daughter was. It seemed to Q.N. that there seemed to be a lot of tension in the room. It appeared as if appellant and McConnell were mad at each other. As Q.N. put it, "typical stuff like boyfriend/girlfriend stuff." McConnell picked his daughter up and played with her.

Appellant came out of the bedroom wearing a dress, saying that this was the dress she wanted to wear for her birthday in Las Vegas. According

5

to Q.N., McConnell did not appear to be interested.  There was not much conversation except for the reference to Las Vegas.  Q.N. continued to sense the tension between appellant and McConnell.

At one point, appellant told Q.N. that she wanted to go to Las Vegas with McConnell, but she said they were "having issues."  Q.N. told appellant that she should go with friends, or Q.N. would go with her, and that appellant should have fun, whatever she was going to do.  Appellant did not elaborate on what the issues were between her and McConnell.

Q.N. left appellant's apartment around 7:00 p.m.  When she learned the next day that McConnell had been killed, Q.N. was "very, very shocked."

We know nothing of what transpired between the time Q.N. left and the 911 call placed by appellant at 12:40 a.m. on April 20, 2016.

McConnell placed the call from his cell phone.  In the call, McConnell addresses not the 911 operator but appears to be speaking to appellant. McConnell states repeatedly that appellant is threatening him and asks appellant why she grabbed the knife and why she is trying to stab McConnell in the face.  There is one extended statement by McConnell:  "because you've been threatening to stab me.  You've been threatening to attack me.  Then . . . why did you say you were gonna stab me in my face, Chanel [appellant]? Why did you say you're gonna stab me in my face, Chanel?  No, I'm not trying to make this.  I'm trying to protect myself because you're trying to attack me—you've been hurting me and they're calling me because you've been threatening me.  And you said you would attack me.  If you say you gonna attack me . . . How am I . . . How am I not trying to protect myself?" Appellant's response to this was:  "I'm not f*** crazy."  The 911 operator disconnected at this point.

The 911 operator called back within what both parties agree was either less than a minute or two minutes.  The operator asked what was going on. McConnell said, "Stop, Chanel.  My ex just attacked me *** she won't let me." The operator asked for the address.  This was followed by some unintelligible exclamations by appellant ("Help me.  Please . . . Ow . . . Ow"), and then McConnell:  "Help.  No, let me go.  Let me go! . . . Chanel, stop!"  The second call then disconnected.

6

B.S. lived across a very narrow hallway from appellant's apartment; the front doors of these two apartments looked right at each other. Just after midnight on April 20, 2016, B.S. heard a male voice followed half a minute later by a female voice. He heard a conversation going on for a couple of minutes. It stopped, and when it started again, he heard a female voice say two or three times, "Get out." B.S. characterized the voice as sharp and scared. Next, he heard a male voice but he could not make out the words. Then it was silent for about five minutes.[3]

Next, B.S. heard what sounded like glass breaking, a short pause of perhaps five seconds, and then screaming and shouting. B.S. heard the doors opening to appellant's apartment and then heard a knock on his door. He opened the door to appellant, who said, "Help me. He's dead."

Appellant was holding a child. Appellant was dressed in white; there were red stains on her clothes that looked fresh. B.S. thought that appellant might be hurt too and he decided to call 911, which he did about 30 seconds after he opened the door.

After giving the 911 operator the address, B.S. told the operator that appellant was saying that someone was dead. B.S. walked into appellant's apartment with his phone still connected to the 911 operator. Responding to the operator's request to tell her what happened, B.S. said that they had been fighting, McConnell was "doing physical violence," and McConnell had said that he was going to call the police. Appellant is heard to say that McConnell threw her against the wall and she tried to stab him "to get him off me. Now, he's on the floor."

Inside appellant's apartment, B.S. saw blood coming from beneath the bedroom door. It looked like a lot of blood. The bedroom door wasn't completely shut. B. S. tried to open the door but couldn't open it enough to step inside. He peered inside and saw a body lying facedown. He heard sirens approaching.

Captain Darius Cunnigan, qualified both as a firefighter and a paramedic, arrived at the scene at 12:53 a.m. When Captain Cunnigan

---

[3] B.S. initially testified the silence lasted about half a minute but changed his mind.

opened the door to appellant's apartment, he saw appellant in her panties and bra holding a child, covered from head to toe with blood, and screaming, " 'It was self-defense, it was self-defense.' " He asked appellant to calm down and requested the police on the scene to take care of appellant.

Captain Cunnigan found McConnell on the bedroom floor shoved against the door. McConnell was alive and gasping for air, but he was not responsive. The door had to be removed to move McConnell. He was taken to the entry of the apartment where there was more room to work on him. He was bleeding heavily. The paramedics left with McConnell at 1:02 a.m. and arrived at the hospital at 1:10 a.m. McConnell was pronounced dead at 1:13 a.m.

Police officers conducted a sweep of appellant's apartment and found a knife in the bedroom.

### 5. Appellant's physical condition

Appellant was examined by a police detective around 8:00 a.m. on April 20, 2016. Appellant is five feet seven inches tall and weighed between 110 and 115 pounds. There were no marks, bruises, or swelling on her face. There were no injuries, swelling, or redness to her neck. There was a quarter-inch incision on her left index finger. There were no injuries to her hands.

Appellant told the same detective that her legs were pulled out from under her and she was allegedly dragged into the bedroom. The detective looked for physical corroboration of this by way of scratches on the ground but found none.

Whether photographs taken of appellant on April 22, 2016, show any injuries is a disputed question. A female police officer witnessed police photographs being taken of appellant in the afternoon of April 22, 2016. According to this officer, the only injury was a small cut to appellant's left index finger. There were no other injuries to her arms, front or back of her legs other than a small bruise on her left thigh, no injuries to her neck, a small redness by the right shoulder blade, and no injuries, scratches, or bruises to her face.

A deputy public defender was asked to take another set of photographs of appellant. She did so. Appellant in her opening brief characterizes these

8

photographs as showing "minor injuries to her leg, neck, and face below her eye, and bruising on her arm and her upper chest."

We need not resolve this controversy. We are satisfied that appellant sustained no major injuries on April 19 or 20, 2016, but that McConnell sustained numerous serious injuries, one of which was fatal. We turn to this next.

### 6. *McConnell's injuries*

Dr. Job Augustine, a deputy medical examiner with the Los Angeles Department of Medical Examiner-Coroner, performed the autopsy on McConnell. McConnell was six feet tall and weighed 136 pounds. The cut that severed the carotid artery was the fatal injury. The manner of death was homicide.

Dr. Augustine found 16 "sharp force injuries" to McConnell's body. These wounds were consistent with the use of the knife found in the bedroom. Dr. Augustine explained that "sharp force injuries" are stabs and incisions. A stab penetrates into the body and an incision is longer on the skin surface than the depth of its penetration into the body.

McConnell sustained four stab wounds. One was on the back of the neck. It penetrated three inches. Its direction was from the back to the front of the body. The second was on the left upper body region. This penetrated four and three-quarters inches. The direction was from the back of the body to the front and downward. This was the largest wound inflicted on McConnell. This cut completely transected the carotid artery and it was fatal. The third stab wound was to the right upper back. It had a depth of three inches. The direction of this wound was also from the back to the front. The fourth stab wound was to the upper, mid-back. The direction was from the back to the front.

McConnell had sustained 12 incision wounds. Five of these were in the head area.[4] There were two incisions on the back of the neck. There were two incisions in the shoulder area, one on the right, the other on the left. There was one incision on the right hand and one on the left hand.

---

[4] They were to the top of the head, the back of the head, to the left of the previous incision, slightly below the previous incision, and the left side of the head at the temple.

The injuries were consistent with appellant approaching McConnell from behind and inflicting these injuries. The hand injuries were consistent with McConnell putting his hands up when appellant attacked him with the knife. There were no bruises, abrasions, or scratches on McConnell's body. Tests for drugs and alcohol were negative.

A semiretired forensic scientist with the Los Angeles County Sheriff Department crime laboratory, who was a bloodstain pattern expert, testified that some of the blood splatter found on the bedroom door where McConnell's body was found originated at about 22 inches from the floor, which was consistent with McConnell being on the floor or on his knees.

### 7. *The defense's case-in-chief*

The defense's case-in-chief was of such diminishing importance that the appellant's opening brief makes no mention of it, save for the testimony of Francisco S., a neighbor, who testified that he heard shouting and arguments emanating from appellant's apartment. Appellant did not testify, leaving it to two other witnesses to testify about equivocal but hardly criminal conduct by McConnell, none of which had any relevance to the case at hand.

## DISCUSSION

## I. THE TRIAL COURT DID NOT ERR
## WHEN IT REFUSED TO INSTRUCT ON SELF-DEFENSE

Appellant contends that "[b]ecause there was substantial evidence that [she] actually and reasonably believed she was in imminent danger of great bodily injury or death and that immediate use of force was necessary to defend herself against that danger, the trial court's ruling [refusing to instruct on self-defense] violated state law and [appellant's] federal due process rights."

### 1. *Appellant must have acted out of fear alone and not out of anger or other emotions; the perceived peril must have been imminent*

"A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of Section 197,[5] to prevent which homicide may be

---

[5] "Homicide is . . . justifiable when committed by any person in any of the following cases:  [¶] . . . [¶]

10

lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone." (§ 198.)

The concept recognized by this statute is referred to as the doctrine of apparent necessity, i.e., an honest and reasonable belief both in the apparent peril *and* the need for defense. (1 Witkin, Cal. Criminal Law (4th ed. 2020) Defenses, § 68, p. 509.)

It is important that "[a] bare fear is not enough; 'the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears *alone.*' (Pen. Code, § 198.)" (*People v. Flannel* (1979) 25 Cal.3d 668, 675, italics added.)

In a setting which was as highly emotionally charged as the one between appellant and McConnell on the night of April 20, 2016, the evidence must be that appellant acted out of fear alone and not as a result of other overwhelming emotions. As the court in *People v. Trevino* (1988) 200 Cal.App.3d 874 aptly observed: "[T]he party killing may justifiably use deadly force in self-defense as long as the use of such force is motivated *only* by a reasonable fear and the belief that it is necessary to prevent his death or great bodily injury. The party killing is not precluded from feeling anger or other emotions save and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force. If they are, the homicide cannot be justified on a theory of self-defense." (*Id.* at p. 879.)

We must therefore search the record for evidence that appellant acted out of fear alone and not out of the press of other emotions. And other emotions were never far from the unhappy relationship between appellant and McConnell. Appellant's anger at McConnell over his apparent abandonment of appellant and their young child and her anger at his refusal

---

"(2) When committed in defense of habitation, property, or person, against one who manifestly intends and endeavors, by violence or surprise, to commit a felony . . . .

"(3) When committed in the lawful defense of such person . . . when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished . . . ." (§ 197, subds. (2) & (3).)

to continue with their relationship or even to talk about that issue—all of these emotions had flared before and of course could ignite again. Yet these emotions do not justify the use of deadly force.

Another requirement that must be met under the doctrine of apparent necessity is that the peril must be imminent. " '[T]he peril must have existed or appeared to the defendant to have existed at the very time the fatal shot was fired. In other words, the peril must appear to the defendant as immediate and present and not prospective or even in the near future. An imminent peril is one that, from appearances, must be instantly dealt with.' " (*People v. Aris* (1989) 215 Cal.App.3d 1178, 1187 [citing jury instructions].) Fear of future harm, no matter how substantial, or how great the likelihood of the harm, is not enough. (*People v. Hill* (2005) 131 Cal.App.4th 1089, 1101.) We must therefore also search the record for evidence that the deadly peril that appellant was allegedly facing was imminent.

### 2. *The standard of review*

In our de novo review of the trial court's decision not to instruct on self-defense (*People v. Cole* (2004) 33 Cal.4th 1158, 1217), we consider the evidence in the light most favorable to appellant and resolve all doubts about the sufficiency of the evidence in her favor. (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1483.) On the other hand, when, as in this case, there is no evidence to support the instruction, there is no duty to instruct. (*People v. Turville* (1959) 51 Cal.2d 620, 632–633; see generally 5 Witkin, Cal. Criminal Law, *supra,* § 674, p. 1040.)

### 3. *The trial court's ruling*

The defense requested an instruction on self-defense. The defense relied heavily on the transcript of B.S.'s 911 call, to which we shall return below.

The trial court denied the request and gave an extended explanation for its ruling. Among other reasons, the trial court noted that appellant had stabbed McConnell a total of 16 times, with four stab wounds in the back, which the court stated did not support a self-defense theory. The court stated: "There is no evidence that the victim attacked the defendant. The opposite is true with regard to the defendant. The victim here calls 9-1-1 to report that she is attacking him. That's the evidence in the case."

12

### 4. The basic facts do not support a self-defense instruction

As the trial court noted, the salient, uncontroverted fact is that appellant stabbed McConnell four times in his back and that all but two of the incision wounds were to the back.[6] The stab wounds were to the back of his neck, to the back left upper body, which was the fatal blow, the back right upper body, and the back mid-upper body.

Appellant does not come to grips with this physical fact, which puts her self-defense theory under severe stress. Stabbing appellant in his back when he was facing away from her and was not in a physical position to inflict any harm on appellant, and is not consistent with the theory that McConnell was the aggressor. It is, however, consistent with the view that appellant was the aggressor. If she was the aggressor, self-defense on her part is of course precluded. Since 14 out of the 16 wounds were inflicted on McConnell's back, it is much more likely than not that these blows were struck when McConnell was unable to defend himself and when he was not in a position to threaten appellant.

This is all the more true if McConnell was actually on his knees when the fatal blows were struck. There is some evidence by way of blood splatter that this was so. Certainly, if he was on his knees (and this would also explain that the stab wounds were downward thrusts) with his back turned to appellant, he was absolutely in no position to attack her, or even threaten her, but he was certainly extraordinarily vulnerable to repeated thrusts by the knife held by appellant.

It is also a fact that the four stab wounds penetrated to depths of three to four and three-quarters inches. This means that these blows were delivered with a great deal of force, very likely in quick succession since the stab wounds were all in the same area. This suggests that appellant was motivated by rage or fury and not by fear. But it is only fear that justifies the homicide.

The fact that most of the 16 wounds were inflicted on McConnell's back also suggests that, even assuming that McConnell was the aggressor, once he

---

[6] Two incision wounds were to the hands, which were defensive wounds.

turned his back on appellant, the attack was over.  The question then becomes whether appellant's attack was justified.  However, there simply are no facts of record that would allow us to examine this possibility.  We turn next to the absence of evidence that would support a self-defense instruction.

### 5.  *There is no evidence to support a self-defense instruction*

Appellant relies heavily on the 911 calls to support her theory that she was in fear for her life.  Ignoring everything that McConnell said in the 911 calls, appellant has selected these brief snippets as evidence that she was in fear for her life:  "Get off me! Please!" and "Ow" four times.  With the best of will, it is impossible to read into any of these cryptic words any kind of fear, much less fear for her life.  While the scene was clearly very emotional as these outbursts confirm, it is only fear that justifies killing in self-defense.  That appellant was angry or even furious does not justify the homicide.

Appellant next seizes on the 911 call generated by witness B.S.  She cites B.S.'s words to the operator, "[T]hey were fighting—he was, he was doing physical violence, he said he was going to call the police on her," "And she—you [apparently addressing appellant] stabbed him?" as "contemporaneous evidence of McConnell attacking [appellant]."  Appellant also refers to B.S.'s question to appellant, "was he starting to hurt you or something?" and appellant's answer "yes."  We fail to see how B.S.'s garbled reference to fighting, closely followed by McConnell calling the police is evidence of "McConnell attacking [appellant]."  McConnell would hardly be calling the police if he were attacking appellant.  There is also the statement by appellant, "He threw me against the wall and I tried to stab him to get him off me.  Now, he's on the floor."  Even on the cold record, this statement sounds oddly controlled and confident, even triumphant.  At any rate, this is not evidence of fear.

In any event, it is a comment on the lack of evidence that appellant must rely on the confused and excited comments of witness B.S., who was not a percipient witness to the altercation between appellant and McConnell.

Compared to the few equivocal snippets of text on which appellant relies, the first 911 call by McConnell is a searing call for help in the face of a

furious person with a knife.[7]  Appellant's truculent response, "I'm not f***
crazy," suggests a person in control but not a person in fear.  In any event,
this extended outburst by McConnell is the only coherent picture that we get
about what was going on in these fateful minutes.  And that picture is one of
appellant threatening McConnell with the knife with which she ultimately
killed him.  This passage tells of McConnell's justified fear and it shows
appellant as the armed aggressor.

Appellant's claim that McConnell had in the past physically attacked
her is hollow.  The claim lacks substance in that appellant herself withdrew
the only one that was not conclusory.  The two conclusory claims that she did
make are not predicated on any evidence.  Testimony by Francisco S. about
arguments and fighting by unidentified persons hardly deserves mention.

Contrary to appellant's claim that she was injured, there is no evidence
of any substantial injuries to appellant, who also admits that the injuries she
claims she sustained were minor.  The absence of any substantial injuries,
when compared to those inflicted on the alleged attacker, is yet another
circumstance that suggests that the attacker was appellant, not McConnell.

### 6.  A verdict based on self-defense would have been based on speculation and conjecture

The record must contain some evidence that appellant was in fear for
her life and that the threat was imminent.  Under the doctrine of apparent
necessity, there must be evidence of an honest and reasonable belief both in
the apparent peril *and* the need for defense.  (1 Witkin,  Cal. Criminal Law,
*supra*, § 68, p. 509.)

While there is evidence that both McConnell and appellant were in
some sort of highly emotional state by midnight of April 20, 2016, there is no

---

[7] "[B]ecause you've been threatening to stab me.  You've been
threatening to attack me.  Then . . . why did you say you were gonna stab me
in my face, Chanel [appellant]?  Why did you say you're gonna stab me in my
face, Chanel?  No, I'm not trying to make this.  I'm trying to protect myself
because you're trying to attack me—you've been hurting me and they're
calling me because you've been threatening me.  And you said you would
attack me.  If you say you gonna attack me . . . How am I . . . How am I not
trying to protect myself?"

15

evidence that appellant was in fear of her life and that the threat was imminent. Other than the three 911 calls, there is absolutely no evidence about what transpired between these two people between 7:00 p.m. on April 19, 2016, when Q.N. left appellant's apartment, and when McConnell was stabbed multiple times shortly after midnight. There is no evidence whatsoever that McConnell was armed; the only evidence is that appellant had the knife with which she killed him. We cannot even get close to examining whether the threat to appellant was imminent since, absent any evidence, we know nothing about any threat to appellant. The only thing we do know is that shortly before he was murdered, McConnell apparently feared for his safety. We are unable to examine whether appellant had an honest and reasonable belief that she was in imminent danger (*People v. Dawson* (1948) 88 Cal.App.2d 85, 96 [honest and reasonable belief required]) since we have no idea what the threat was that she was allegedly facing. McConnell being unarmed, we would be required to speculate as to the threat that he was posing. Since his back was turned to appellant when he was struck down, it is hard to imagine (and that is what we would have to do) what the threat was that he posed.

This brings us to why the trial court was right in refusing to instruct the jury on self-defense. Any verdict based on the defense of self-defense would have been based on sheer conjecture and speculation. There were simply no facts of record on which this defense could have been based. The absence of evidence about the crucial hours before the homicide is one of the hallmarks of this case. Only two people know what happened between 7:00 p.m. and midnight on April 20, 2016, and one of them is dead.

The trial court's decision not to instruct on self-defense was correct. There was no evidence to support such an instruction. The only known fact of record, which is that McConnell's back was turned to appellant when she killed him, supports the conclusion that she was the aggressor.

## II. THERE WAS NO EVIDENCE TO SUPPORT AN IMPERFECT SELF-DEFENSE INSTRUCTION

The defense requested instructions on "imperfect self-defense." The trial court refused to give this instruction. The court did instruct on voluntary manslaughter based on heat of passion. Appellant contends in her

16

appeal that the instruction based on imperfect self-defense should have been given.

"An honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter." (*People v. Flannel, supra,* 25 Cal.3d at p. 674, italics omitted.) An "honest but unreasonable belief" justifies a voluntary manslaughter conviction.

In this argument, appellant returns to her contention that appellant actually believed that McConnell put her in imminent danger of death or great bodily injury, making the use of deadly force necessary. As appellant puts it: "[Her] own words, by themselves, satisfied the requirement that she genuinely believed she needed to defend herself against imminent danger. Her cries of pain and pleas for help during the second 911 call was evidence McConnell was injuring her and that consequently she was in fear for her safety."

To say that appellant was emitting "cries of pain and pleas for help" is taking a few words and some inarticulate noises out of context.

Appellant's reference is to the second 911 call, when the 911 operator called back. After the operator asked what was going on and what the address was, McConnell responded: "Elden Avenue! She won't let me leave! Send people out, she won't let me leave! Stop, Chanel, Stop! Chanel, Stop." The operator asked for the address again. It was now that appellant twice said, "Help me. Please," while McConnell was saying that appellant "won't stop" and again asked appellant to let him go. At this point, the transcript records appellant as saying "Ow" several times. McConnell again says, "Help. No, let me go. Let me go!" and "Chanel, stop!"[8]

---

[8] The actual sequence after McConnell asked for help in leaving appellant's apartment was: "[Operator] What's the address, sir? [¶] [Appellant] Help me. Please. [¶] [McConnell] Chanel, stop. [¶] [Appellant] Help me. Please. [¶] [Operator] Sir what's—What's the address? [¶] [Appellant] Get off me! Please! [¶] [McConnell] She won't stop *** Avenue. Apartment *** [¶] [Appellant] Ow! [¶] [Operator] Hello. [¶] [Appellant] Ow! Ow! [¶] [McConnell] *** [¶] [Appellant] Ow![¶] [McConnell] Help. No,

17

It seems that McConnell was trying to get away and that appellant was hindering him in some way from leaving. It appears that McConnell wanted her to stop doing whatever she was doing in blocking him from getting away. In fact, McConnell was asking for help in stopping appellant from hindering him from leaving ("Send people out, she won't let me leave!"). Appellant's calls for help should be read in this context. They were most probably requests for help to stop McConnell from leaving. The issue between them at that point was not an attack by McConnell—there is absolutely nothing that suggests such an attack—the issue was that McConnell wanted to get away and she would not let him leave. What "ow" means is anyone guess, but it should be read in the context of the exchange, which was that she was stopping McConnell from leaving. It should be kept in mind that one of their perennial issues appears to have been his wish, and her disinclination, for the relationship to be terminated.

We return to the point made in the preceding section that there is no evidence that McConnell was a threat, much less is there evidence of an imminent threat. There is certainly no evidence as to what the alleged threat was. Importantly, there is also no evidence that appellant had an honest belief, even if unreasonable, that appellant was in imminent peril to her life or of sustaining great bodily injury. The transcript of the 911 call shows that appellant and McConnell were struggling over an issue that had nothing to do with a threat to appellant, which was the continuation (or termination) of their relationship.

There was no evidence to justify an instruction on imperfect self-defense.

In light of our conclusion that there was no evidence that warranted an instruction on self-defense and the instruction on imperfect self-defense, it is not necessary for us to consider the balance of appellant's contentions, including the rather improbable claim that appellant used no more force than was necessary to defend herself against McConnell's attacks. Sixteen knife wounds inflicted on the back of the unarmed victim, who may have been

---

let me go. Let me go! [¶] [Appellant] *** [¶] [McConnell] I'm not doing anything."

kneeling, is a grim exercise in excess by any standard.  Because we conclude that there is no evidence of apparent necessity, appellant's argument is moot.

## DISPOSITION

The judgment is affirmed and the matter is remanded to the trial court with directions to correct the abstract of judgment to show that appellant is entitled to one more day of custody credit.  The superior court shall issue a new abstract of judgment that shows the correct number of custody credits.  The court shall forward the new abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



CHAVEZ, J.



HOFFSTADT, J.

19